## PARKER, DIRECTOR OF AGRICULTURE, ET AL. *v.* BROWN.

No. 46. Argued May 5, 1942 (No. 1040, 1941 Term). Reargued October 12, 13, 1942.—Decided January 4, 1943.

*Messrs. Walter L. Bowers,* Deputy Attorney General of California, and *Strother P. Walton,* with whom *Messrs. Earl Warren,* Attorney General, and *W. R. Augustine,* Deputy Attorney General, were on the briefs, for appellants on the reargument. *Mr. Walter L. Bowers* argued the cause for appellants on the original argument.

*Mr. G. Levin Aynesworth,* with whom *Mr. Christian M. Ozias* was on the brief, for appellee.

By special leave of Court, *Mr. Robert L. Stern,* with whom *Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. Charles H. Weston* and *Robert H.*

344

*Shields* were on the brief, for the United States, as *amicus curiae,* asserting that the state program, though not inconsistent with federal agricultural legislation, was invalid under the Sherman Act and the Commerce Clause.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

The questions for our consideration are whether the marketing program adopted for the 1940 raisin crop under the California Agricultural Prorate Act[1] is rendered invalid (1) by the Sherman Act, or (2) by the Agricultural Marketing Agreement Act of 1937, as amended, 7 U. S. C. §§ 601, *et seq.,* or (3) by the Commerce Clause of the Constitution.

Appellee, a producer and packer of raisins in California, brought this suit in the district court to enjoin appellants— the State Director of Agriculture, Raisin Proration Zone No. 1, the members of the State Agricultural Prorate Advisory Commission and of the Program Committee for Zone No. 1, and others charged by the statute with the administration of the Prorate Act—from enforcing, as to appellee, a program for marketing the 1940 crop of raisins produced in "Raisin Proration Zone No. 1." After a trial upon oral testimony, a stipulation of facts and certain exhibits, the district court held that the 1940 raisin marketing program was an illegal interference with and undue burden upon interstate commerce and gave judgment for appellee granting the injunction prayed for. 39 F. Supp. 895. The case was tried by a district court of three judges

---

[1] Act of June 5, 1933, ch. 754, Statutes of California of 1933, as amended by chs. 471 and 743, Statutes of 1935; ch. 6, Extra Session, 1938; chs. 363, 548 and 894, Statutes of 1939; and chs. 603, 1150 and 1186, Statutes of 1941. Its constitutionality under both Federal and State Constitutions was sustained by the California Supreme Court in *Agricultural Prorate Commission* v. *Superior Court,* 5 Cal. 2d 550, 55 P. 2d 495.

and comes here on appeal under §§ 266 and 238 of the Judicial Code as amended, 28 U. S. C. §§ 380, 345.

As appears from the evidence and from the findings of the district court, almost all the raisins consumed in the United States, and nearly one-half of the world crop, are produced in Raisin Proration Zone No. 1. Between 90 and 95 per cent of the raisins grown in California are ultimately shipped in interstate or foreign commerce.

The harvesting and marketing of the crop in California follows a uniform procedure. The grower of raisins picks the bunches of grapes and places them for drying on trays laid between the rows of vines. When the grapes have been sufficiently dried he places them in "sweat boxes" where their moisture content is equalized. At this point the curing process is complete. The growers sell the raisins and deliver them in the "sweat boxes" to handlers or packers whose plants are all located within the Zone. The packers process them at their plants and then ship them in interstate commerce. Those raisins which are to be marketed in clusters are sometimes merely packed, unstemmed, in suitable containers, but are more often cleaned, fumigated, and, when necessary, steamed to make the stems pliable. Most of the raisins are not sold in clusters; such raisins are stemmed before packing, and most packers also clean, grade and sort them. One variety is also seeded before packing.

The packers sell their raisins through agents, brokers, jobbers and other middlemen, principally located in other states or foreign countries. Until he is ready to ship the raisins the packer stores them in the form in which they have been received from producers. The length of time that the raisins remain at the packing plants before processing and shipping varies from a few days up to two years, depending upon the packer's current supply of raisins and the market demand. The packers frequently place orders with producers for fall delivery, before the

crop is harvested, and at the same time enter into contracts for the sale of raisins to their customers. In recent years most packers have had a substantial "carry over" of stored raisins at the end of each crop season, which are usually marketed before the raisins of the next year's crop are marketed.

The California Agricultural Prorate Act authorizes the establishment, through action of state officials, of programs for the marketing of agricultural commodities produced in the state, so as to restrict competition among the growers and maintain prices in the distribution of their commodities to packers. The declared purpose of the Act is to "conserve the agricultural wealth of the State" and to "prevent economic waste in the marketing of agricultural products" of the state. It authorizes (§ 3) the creation of an Agricultural Prorate Advisory Commission of nine members, of which a state official, the Director of Agriculture, is ex-officio a member. The other eight members are appointed for terms of four years by the Governor and confirmed by the Senate, and are required to take an oath of office. § 4.

Upon the petition of ten producers for the establishment of a prorate marketing plan for any commodity within a defined production zone (§ 8), and after a public hearing (§ 9), and after making prescribed economic findings ·(§ 10) showing that the institution of a program for the proposed zone will prevent agricultural waste and conserve agricultural wealth of the state without permitting unreasonable profits to producers, the Commission is authorized to grant the petition. The Director, with the approval of the Commission, is then required to select a program committee from among nominees chosen by the qualified producers within the zone, to which he may add not more than two handlers or packers who receive the regulated commodity from producers for marketing. §§ 11, 14, 15.

The program committee is required (§ 15) to formulate a proration marketing program for the commodity produced in the zone, which the Commission is authorized to approve after a public hearing and a "finding that the program is reasonably calculated to carry out the objectives of the Act." The Commission may, if so advised, modify the program and approve it as modified. If the proposed program, as approved by the Commission, is consented to by 65 per cent in number of producers in the zone owning 51 per cent of the acreage devoted to production of the regulated crop, the Director is required to declare the program instituted. § 16.

Authority to administer the program, subject to the approval of the Director of Agriculture, is conferred on the program committee. §§ 6, 18, 22. Section 22.5 declares that it shall be a misdemeanor, which is punishable by fine and imprisonment (Penal Code § 19), for any producer to sell or any handler to receive or possess without proper authority any commodity for which a proration program has been instituted. Like penalty is imposed upon any person who aids or abets in the commission of any of the acts specified in the section, and it is declared that each "infraction shall constitute a separate and distinct offense." Section 25 imposes a civil liability of $500 "for each and every violation" of any provision of a proration program.

The seasonal proration marketing program for raisins, with which we are now concerned, became effective on September 7, 1940. This provided that the program committee should classify raisins as "standard," "substandard," and "inferior"; "inferior" raisins are those which are unfit for human consumption, as defined in the Federal Food, Drug and Cosmetic Act, 21 U. S. C. §§ 301 *et seq.* The committee is required to establish receiving stations within the zone to which every producer must deliver all raisins which he desires to market. The raisins are graded at these stations. All inferior raisins are to be placed in the

"inferior raisin pool," to be disposed of by the committee "only for assured by-product and other diversion purposes." All substandard raisins, and at least 20 per cent of the total standard and substandard raisins produced, must be placed in a "surplus pool." Raisins in this pool may also be disposed of only for "assured by-product and other diversion purposes," except that under certain circumstances the program committee may transfer standard raisins from the surplus pool to the stabilization pool. Fifty per cent of the crop must be placed in a "stabilization pool."

Under the program the producer is permitted to sell the remaining 30 per cent of his standard raisins, denominated "free tonnage," through ordinary commercial channels, subject to the requirement that he obtain a "secondary certificate" authorizing such marketing and pay a certificate fee of $2.50 for each ton covered by the certificate. Certification is stated to be a device for controlling "the time and volume of movement" of free tonnage into such ordinary commercial channels. Raisins in the stabilization pool are to be disposed of by the committee "in such manner as to obtain stability in the market and to dispose of such raisins," but no raisins (other than those subject to special lending or pooling arrangements of the Federal Government) can be sold by the committee at less than the prevailing market price for raisins of the same variety and grade on the date of sale. Under the program the committee is to make advances to producers of from $25 to $27.50 a ton, depending upon the variety of raisins, for deliveries into the surplus pool, and from $50 to $55 a ton for deliveries into the stabilization pool. The committee is authorized to pledge the raisins held in those pools in order to secure funds to finance pool operations and make advances to growers.

Appellee's bill of complaint challenges the validity of the proration program as in violation of the Commerce

Clause and the Sherman Act; in support of the decree of the district court he also urges that it conflicts with and is superseded by the Federal Agricultural Marketing Agreement Act of 1937. The complaint alleges that he is engaged within the marketing zone both in producing and in purchasing and packing raisins for sale and shipment interstate; that before the adoption of the program he had entered into contracts for the sale of 1940 crop raisins; that, unless enjoined, appellants will enforce the program against appellee by criminal prosecutions and will prevent him from marketing his 1940 crop, from fulfilling his sales contracts, and from purchasing for sale and selling in interstate commerce raisins of that crop.

Appellee's allegations of irreparable injury are in general terms, but it appears from the evidence that he had produced 200 tons of 1940 crop raisins; that he had contracted to sell 762½ tons of the 1940 crop; that he had dealt in 2,000 tons of raisins of the 1939 crop, and expected to sell, if the challenged program were not in force, 3,000 tons of the 1940 crop at $60 a ton; that the pre-season price to growers of raisins of the 1940 crop, before the program became effective, was $45 per ton, and that immediately afterward it rose to $55 per ton or higher. It also appears that, the district court having awarded the final injunction prayed, appellee has proceeded with the marketing of his 1940 crop and has disposed of all except twelve tons, which remain on hand. Although the district court found that the amount in controversy exceeds $3,000, we are of opinion that as the complaint assails the validity of the program under the anti-trust laws, 15 U. S. C. §§ 1–33, the suit is one "arising under" a "law regulating commerce"; and allegation and proof of the jurisdictional amount are not required. 28 U. S. C. §§ 41 (1), (8); *Peyton* v. *Railway Express Agency,* 316 U. S. 350. The majority of the Court is also of opinion that the suit is within the equity jurisdiction of the court, since the com-

plaint alleges, and the evidence shows, threatened irreparable injury to respondent's business and threatened prosecutions by reason of his having marketed his crop under the protection of the district court's decree.

*Validity of the Prorate Program under the Sherman Act.*

Section 1 of the Sherman Act, 15 U. S. C. § 1, makes unlawful "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States." And § 2, 15 U. S. C. § 2, makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." We may assume for present purposes that the California prorate program would violate the Sherman Act if it were organized and made effective solely by virtue of a contract, combination or conspiracy of private persons, individual or corporate. We may assume also, without deciding, that Congress could, in the exercise of its commerce power, prohibit a state from maintaining a stabilization program like the present because of its effect on interstate commerce. Occupation of a legislative "field" by Congress in the exercise of a granted power is a familiar example of its constitutional power to suspend state laws. See *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 505; *Napier* v. *Atlantic Coast Line,* 272 U. S. 605, 607; *Missouri Pacific R. Co.* v. *Porter,* 273 U. S. 341; *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498, 510.

But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its

legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. The Act is applicable to "persons" including corporations (§ 7), and it authorizes suits under it by persons and corporations (§ 15). A state may maintain a suit for damages under it, *Georgia* v. *Evans,* 316 U. S. 159, but the United States may not, *United States* v. *Cooper Corp.,* 312 U. S. 600—conclusions derived not from the literal meaning of the words "person" and "corporation" but from the purpose, the subject matter, the context and the legislative history of the statute.

There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only "business combinations." 21 Cong. Rec. 2562, 2457; see also at 2459, 2461. That its purpose was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations, abundantly appears from its legislative history. See *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 492–93 and n. 15; *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, affirmed 175 U. S. 211; *Standard Oil Co.* v. *United States,* 221 U. S. 1, 54–58.

True, a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful, *Northern Securities Co.* v. *United States,* 193 U. S. 197, 332, 344–47; and we have no question of the state or its municipality becoming a participant in a private agreement or combina-

tion by others for restraint of trade, cf. *Union Pacific R. Co.* v. *United States,* 313 U. S. 450. Here the state command to the Commission and to the program committee of the California Prorate Act is not rendered unlawful by the Sherman Act since, in view of the latter's words and history, it must be taken to be a prohibition of individual and not state action. It is the state which has created the machinery for establishing the prorate program. Although the organization of a prorate zone is proposed by producers, and a prorate program, approved by the Commission, must also be approved by referendum of producers, it is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy. The prerequisite approval of the program upon referendum by a prescribed number of producers is not the imposition by them of their will upon the minority by force of agreement or combination which the Sherman Act prohibits. The state itself exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required vote on the referendum is one of these conditions. Compare *Currin* v. *Wallace,* 306 U. S. 1, 16; *Hampton & Co.* v. *United States,* 276 U. S. 394, 407; *Wickard* v. *Filburn, ante,* p. 111.

The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit. *Olsen* v. *Smith,* 195 U. S. 332, 344–45; cf. *Lowenstein* v. *Evans,* 69 F. 908, 910.

*Validity of the Program Under the Agricultural Marketing Agreement Act.*

The Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U. S. C. §§ 601 *et seq.,* authorizes the Secre-

tary of Agriculture to issue orders limiting the quantity of specified agricultural products, including fruits, which may be marketed "in the current of . . . or so as directly to burden, obstruct, or affect interstate or foreign commerce." Such orders may allot the amounts which handlers may purchase from any producer by means which equalize the amount marketed among producers; may provide for the control and elimination of surpluses and for the establishment of reserve pools of the regulated produce. § 8c (6). The federal statute differs from the California Prorate Act in that its sanction falls upon handlers alone while the state act (§ 22.5 (3)) applies to growers and extends also to handlers so far as they may unlawfully receive or have in their possession within the state any commodity subject to a prorate program.

We may assume that the powers conferred upon the Secretary would extend to the control of surpluses in the raisin industry through a pooling arrangement such as was promulgated under the California Prorate Act in the present case. See *United States* v. *Rock Royal Co-op.*, 307 U. S. 533; *Currin* v. *Wallace, supra*. We may assume also that a stabilization program adopted under the Agricultural Marketing Agreement Act would supersede the state act. But the federal act becomes effective only if a program is ordered by the Secretary. Section 8c (3) provides that whenever the Secretary of Agriculture "has reason to believe" that the issuance of an order will tend to effectuate the declared policy of the Act with respect to any commodity, he shall give due notice of an opportunity for a hearing upon a proposed order, and § 8c (4) provides that after the hearing he shall issue an order if he finds and sets forth in the order that its issuance will tend to effectuate the declared policy of the Act with respect to the commodity in question. Since the Secretary has not given notice of hearing and has not proposed or promulgated any order regulating raisins, it must be

taken that he has no reason to believe that issuance of an order will tend to effectuate the policy of the Act.

The Secretary, by § 10 (i), is authorized "in order to effectuate the declared policy" of the Act, and "in order to obtain uniformity in the formulation, administration, and enforcement of Federal and State programs relating to the regulation of the handling of agricultural commodities," to confer and coöperate with duly constituted authorities of any state. From this and the whole structure of the Act, it would seem that it contemplates that its policy may be effectuated by a state program either with or without the promulgation of a federal program by order of the Secretary. Cf. *United States* v. *Rock Royal Co-op., supra.* It follows that the adoption of an adequate program by the state may be deemed by the Secretary a sufficient ground for believing that the policies of the federal act will be effectuated without the promulgation of an order.

It is evident, therefore, that the Marketing Act contemplates the existence of state programs at least until such time as the Secretary shall establish a federal marketing program, unless the state program in some way conflicts with the policy of the federal act. The Act contemplates that each sovereign shall operate "in its own sphere but can exert its authority in conformity rather than in conflict with that of the other." H. Rep. No. 1241, 74th Cong., 1st Sess. pp. 22–23; S. Rep. 1011, 74th Cong., 1st Sess. p. 15.[2] The only suggested possibility of conflict is between the declared purposes of the two acts. The object of the federal statute is stated to be the establishment, by exercise

---

[2] See also 79 Cong. Rec. 9470, 11149–50, 11153; Hearings Before the Senate Committee on Agriculture and Forestry on S. 1807 (March, 1935) 29, 73; Hearings Before the House Committee on Agriculture (Feb.–March, 1935) 53, 178–9. The Agricultural Marketing Agreement Act of 1937 was for the most part a reënactment of certain provisions of the Agricultural Adjustment Act of 1933, 48 Stat. 31, as amended in 1935, 49 Stat. 753. Sec. 10 (i) was first introduced in 1935, and reënacted without change in 1937.

of the power conferred on the Secretary, of "orderly marketing conditions for agricultural commodities in interstate commerce" such as will tend to establish "parity prices" for farm products,[3] but with the further purpose that, in the interest of consumers, current consumptive demand is to be considered and that no action shall be taken for the purpose of maintaining prices above the parity level. § 2.

The declared objective of the California Act is to prevent excessive supplies of agricultural commodities from "adversely affecting" the market, and although the statute speaks in terms of "economic stability" and "agricultural waste" rather than of price, the evident purpose and effect of the regulation is to "conserve agricultural wealth of the state" by raising and maintaining prices, but "without permitting unreasonable profits to producers." § 10. The only possibility of conflict would seem to be if a state program were to raise prices beyond the parity price prescribed by the federal act, a condition which has not occurred.[4]

---

[3] A "parity" price is one which will "give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period." 7 U. S. C. § 602 (1). The parity price is computed by multiplying an index of prices paid by farmers for goods used in farm production, and for family living expenses, together with real estate taxes and interest on farm indebtedness, by the average price during the base period of the commodity in question. See Dept. of Agriculture, Parity Prices, What They Are and How They Are Calculated (1942). The base period for commodities other than tobacco and potatoes is August 1909–July 1914. However, by 7 U. S. C. § 608e the period of August 1919–July 1929 or a part thereof may be used for any commodity as to which the Secretary finds and proclaims that adequate statistics for the 1909–14 period are not available. By proclamation dated June 26, 1942, the Secretary designated the period 1919–1929 as the base period for raisins. 7 Fed. Reg. 4867.

[4] The parity price for raisins on June 15, 1942, as published by the Department of Agriculture was $100.51 per ton. Preliminary figures

That the Secretary has reason to believe that the state act will tend to effectuate the policies of the federal act so as not to require the issuance of an order under the latter is evidenced by the approval given by the Department of Agriculture to the state program by the loan agreement between the state and the Commodity Credit Corporation.[5] By § 302 of the Agricultural Adjustment Act of 1938, 52 Stat. 43, 7 U. S. C. § 1302 (a), the Commodity Credit Corporation is authorized "upon the recommendation of the Secretary and with the approval of the President, to make available loans on agricultural commodities . . ." The "amount, terms, and conditions" of such loans are to be "fixed by the Secretary, subject to the approval of the Corporation and the President." Under this authority the Commodity Credit Corporation made loans of $5,146,000 to Zone No. 1, secured by a

show the average price for the 1941–42 crop to be $80.60. Parity Prices, What They Are and How They Are Computed, *supra*, vii. Parity prices for raisins for previous years are not published. However they may be computed from the base period price of $105.80 and the indices of prices paid by farmers published by the Department of Agriculture in the statistical publications cited *infra*, note 9. Such computations for 1933 and subsequent years, supplied by the Department of Agriculture, indicate that while the price received by the farmer for the 1940 crop was $57.60 the parity price for 1940 was $80.41 and for 1941 was $86.76. They further indicate that raisin prices have not since 1933 equalled parity and that the field prices for all crops prior to that of 1941 have been from $15 to $40 per ton below parity.

[5] The Commodity Credit Corporation was created by Executive Order No. 6340, October 16, 1933. It has been continued in existence by Acts of Congress, 49 Stat. 4; 50 Stat. 5; 53 Stat. 510. By Reorganization Plan No. I, 53 Stat. 1429, approved by Act of Congress, 53 Stat. 813, and effective July 1, 1939, the Corporation was transferred to the Department of Agriculture, to be "administered in such department under the general direction and supervision of the Secretary of Agriculture." By Executive Order No. 8219, Aug. 7, 1939, 4 Fed. Reg. 3565, exclusive voting rights in its capital stock were vested in the Secretary.

pledge of 109,000 tons of 1940 crop raisins in the surplus and stabilization pools. These loans were ultimately liquidated by sales of 76,000 tons to packers and 33,000 tons to the Federal Surplus Marketing Administration, an agency of the Department of Agriculture,[6] for relief distribution and for export under the Lend-Lease program.[7] The loans were conditional upon the adoption by the state of the present seasonal marketing program. We are informed by the Government, which at our request filed a brief amicus curiae, that under the loan agreement prices and sales policies as to the pledged raisins were to be controlled by a committee appointed by the Secretary, and that officials of the Department of Agriculture collaborated in drafting the 1940 state raisin program.

---

[6] The Surplus Marketing Administration was created by Reorganization Plan No. III, 45 Stat. 1232, approved 54 Stat. 231, effective June 30, 1940, as a consolidation of the Division of Marketing and Marketing Agreements of the Agricultural Adjustment Administration, and the Federal Surplus Commodities Corporation. The Surplus Commodities Corporation was incorporated on October 4, 1933, under the name of the Federal Surplus Relief Corporation. Its existence as "an agency of the United States under the direction of the Secretary of Agriculture" was continued by Acts of Congress, 50 Stat. 323; 52 Stat. 38. The members of the Corporation are the Secretary of Agriculture, the Administrator of the Agricultural Adjustment Administration, and the Governor of the Farm Credit Administration.

As successor to the Corporation the Surplus Marketing Administration exercises the authority given by § 32 of the Agricultural Adjustment Act of 1935, 7 U. S. C. § 612c, to use 30% of annual gross customs receipts to encourage the exportation, and the domestic consumption by persons in low income groups, of agricultural commodities, and to reëstablish farmers' purchasing power. As successor to the Division of Markets and Marketing Agreements, the Administration is charged with the enforcement of the Agricultural Marketing Agreement Act of 1937.

[7] Report of the President of the Commodity Credit Corporation (1941) 14, 21; Wm. J. Cecil (Zone Agent, Raisin Proration Zone No. 1), The 1940 Raisin Program, 30 Calif. Dept. of Agriculture Bulletin 46.

Section 302 of the Agricultural Adjustment Act of 1938 requires the Commodity Credit Corporation to make non-recourse loans to producers of certain agricultural products at specified percentages of the parity price, and authorizes loans on any agricultural commodity. The Government informs us that in making loans under the latter authority, § 302 has been construed by the Department of Agriculture as requiring the loans to be made only in order to effectuate the policy of federal agricultural legislation.[8] Section 2 of the Agricultural Adjustment Act of 1938 declares it to be the policy of Congress to achieve the statutory objectives through loans. The Agricultural Adjustment Act of 1938 and the Agricultural Marketing Agreement Act of 1937 were both derived from the Agricultural Adjustment Act of 1933, 48 Stat. 31, and are coördinate parts of a single plan for raising farm prices to parity levels. The conditions imposed by the Secretary of Agriculture in the loan agreement with the State of California, and the collaboration of federal officials in the drafting of the program, must be taken as an expression of opinion by the Department of Agriculture that the state program thus aided by the loan is consistent with the policies of the Agricultural Adjustment and Agricultural Marketing Agreement Acts. We find no conflict between the two acts and no such occupation of the legislative field by the mere adoption of the Agricultural Marketing Agreement Act, without the issuance of any order by the Secretary putting it into effect, as would preclude the effective operation of the state act.

We have no occasion to decide whether the same conclusion would follow if the state program had not been adopted with the collaboration of officials of the Department of Agriculture and aided by loans from the Com-

---

[8] See also Report of the President of the Commodity Credit Corporation (1940) 4, 6.

modity Credit Corporation recommended by the Secretary of Agriculture.

*Validity of the Program under the Commerce Clause.*

The court below found that approximately 95 per cent of the California raisin crop finds its way into interstate or foreign commerce. It is not denied that the proration program is so devised as to compel the delivery by each producer, including appellee, of over two-thirds of his 1940 raisin crop to the program committee, and to subject it to the marketing control of the committee. The program, adopted through the exercise of the legislative power delegated to state officials, has the force of law. It clothes the committee with power and imposes on it the duty to control marketing of the crop so as to enhance the price or at least to maintain prices by restraints on competition of producers in the sale of their crop. The program operates to eliminate competition of the producers in the terms of sale of the crop, including price. And since 95 per cent of the crop is marketed in interstate commerce, the program may be taken to have a substantial effect on the commerce, in placing restrictions on the sale and marketing of a product to buyers who eventually sell and ship it in interstate commerce.

The question is thus presented whether in the absence of Congressional legislation prohibiting or regulating the transactions affected by the state program, the restrictions which it imposes upon the sale within the state of a commodity by its producer to a processor who contemplates doing, and in fact does, work upon the commodity before packing and shipping it in interstate commerce, violate the Commerce Clause.

The governments of the states are sovereign within their territory save only as they are subject to the prohibitions of the Constitution or as their action in some measure conflicts with powers delegated to the National Govern-

ment, or with Congressional legislation enacted in the exercise of those powers. This Court has repeatedly held that the grant of power to Congress by the Commerce Clause did not wholly withdraw from the states the authority to regulate the commerce with respect to matters of local concern, on which Congress has not spoken. *Minnesota Rate Cases,* 230 U. S. 352, 399–400; *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 187, *et seq.; California* v. *Thompson,* 313 U. S. 109, 113–14 and cases cited; *Duckworth* v. *Arkansas,* 314 U. S. 390. *A fortiori* there are many subjects and transactions of local concern not themselves interstate commerce or a part of its operations which are within the regulatory and taxing power of the states, so long as state action serves local ends and does not discriminate against the commerce, even though the exercise of those powers may materially affect it. Whether we resort to the mechanical test sometimes applied by this Court in determining when interstate commerce begins with respect to a commodity grown or manufactured within a state and then sold and shipped out of it—or whether we consider only the power of the state in the absence of Congressional action to regulate matters of local concern, even though the regulation affects or in some measure restricts the commerce—we think the present regulation is within state power.

In applying the mechanical test to determine when interstate commerce begins and ends (see *Federal Compress Co.* v. *McLean,* 291 U. S. 17, 21 and cases cited; *Minnesota* v. *Blasius,* 290 U. S. 1 and cases cited) this Court has frequently held that for purposes of local taxation or regulation "manufacture" is not interstate commerce even though the manufacturing process is of slight extent. *Crescent Oil Co.* v. *Mississippi,* 257 U. S. 129; *Oliver Iron Co.* v. *Lord,* 262 U. S. 172; *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165; *Hope Gas Co.* v. *Hall,* 274 U. S. 284; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245; *Champlin Refining*

*Co.* v. *Commission,* 286 U. S. 210; *Bayside Fish Co.* v. *Gentry,* 297 U. S. 422. And such regulations of manufacture have been sustained where, aimed at matters of local concern, they had the effect of preventing commerce in the regulated article. *Kidd* v. *Pearson,* 128 U. S. 1; *Champlin Refining Co.* v. *Commission, supra; Sligh* v. *Kirkwood,* 237 U. S. 52; see *Capital City Dairy Co.* v. *Ohio,* 183 U. S. 238, 245; *Thompson* v. *Consolidated Gas Co.,* 300 U. S. 55, 77; cf. *Bayside Fish Co.* v. *Gentry, supra.* A state is also free to license and tax intrastate buying where the purchaser expects in the usual course of business to resell in interstate commerce. *Chassaniol* v. *Greenwood,* 291 U. S. 584. And no case has gone so far as to hold that a state could not license or otherwise regulate the sale of articles within the state because the buyer, after processing and packing them, will, in the normal course of business, sell and ship them in interstate commerce.

All of these cases proceed on the ground that the taxation or regulation involved, however drastically it may affect interstate commerce, is nevertheless not prohibited by the Commerce Clause where the regulation is imposed before any operation of interstate commerce occurs. Applying that test, the regulation here controls the disposition, including the sale and purchase, of raisins before they are processed and packed preparatory to interstate sale and shipment. The regulation is thus applied to transactions wholly intrastate before the raisins are ready for shipment in interstate commerce.

It is for this reason that the present case is to be distinguished from *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50, and *Shafer* v. *Farmers Grain Co.,* 268 U. S. 189, on which appellee relies. There the state regulation held invalid was of the business of those who purchased grain within the state for immediate shipment out of it. The Court was of opinion that the purchase of the wheat for shipment out of the state without resale or processing was a

part of the interstate commerce. Compare *Chassaniol* v. *Greenwood, supra.*

This distinction between local regulation of those who are not engaged in commerce, although the commodity which they produce and sell to local buyers is ultimately destined for interstate commerce, and the regulation of those who engage in the commerce by selling the product interstate, has in general served, and serves here, as a ready means of distinguishing those local activities which, under the Commerce Clause, are the appropriate subject of state regulation despite their effect on interstate commerce. But courts are not confined to so mechanical a test. When Congress has not exerted its power under the Commerce Clause, and state regulation of matters of local concern is so related to interstate commerce that it also operates as a regulation of that commerce, the reconciliation of the power thus granted with that reserved to the state is to be attained by the accommodation of the competing demands of the state and national interests involved. See *Di Santo* v. *Pennsylvania,* 273 U. S. 34, 44 (with which compare *California* v. *Thompson, supra*).; *South Carolina Highway Dept.* v. *Barnwell Bros., supra; Milk Control Board* v. *Eisenberg Co.,* 306 U. S. 346; *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498, 504–5.

Such regulations by the state are to be sustained, not because they are "indirect" rather than "direct," see *Di Santo* v. *Pennsylvania, supra;* cf. *Wickard* v. *Filburn, supra,* not because they control interstate activities in such a manner as only to affect the commerce rather than to command its operations. But they are to be upheld because upon a consideration of all the relevant facts and circumstances it appears that the matter is one which may appropriately be regulated in the interest of the safety, health and well-being of local communities, and which, because of its local character, and the practical difficulties involved, may never be adequately dealt with

by Congress. Because of its local character also there may be wide scope for local regulation without substantially impairing the national interest in the regulation of commerce by a single authority and without materially obstructing the free flow of commerce, which were the principal objects sought to be secured by the Commerce Clause. See *Minnesota Rate Cases, supra,* 398–412; *California* v. *Thompson, supra,* 113. There may also be, as in the present case, local regulations whose effect upon the national commerce is such as not to conflict but to coincide with a policy which Congress has established with respect to it.

Examination of the evidence in this case and of available data of the raisin industry in California, of which we may take judicial notice, leaves no doubt that the evils attending the production and marketing of raisins in that state present a problem local in character and urgently demanding state action for the economic protection of those engaged in one of its important industries.[9] Between 1914 and 1920 there was a spectacular rise in price of all types of California grapes, including raisin grapes. The price of raisins reached its peak, $235 per ton, in 1921, and was followed by large increase in acreage with accompanying reduction in price. The price of raisins in most

---

[9] The principal statistical sources are U. S. Tariff Commission, Grapes, Raisins and Wines, Report No. 134, Second Series, issued pursuant to 19 U. S. C. § 1332, and the following publications of the U. S. Department of Agriculture: Yearbook of Agriculture (published annually until 1936); Agricultural Statistics (published annually since 1936); Crops and Markets (published quarterly); Season Average Prices and Value of Production, Principal Crops, 1940 and 1941 (Dec. 18, 1941). For general discussions of the economic status of the raisin industry, see Grapes, Raisins and Wines, *supra;* Shear and Gould, Economic Status of the Grape Industry, University of California, Agricultural Experiment Station Bulletin No. 429 (1927); Shear and Howe, Factors Affecting California Raisin Sales and Prices, 1922–29, Giannini Foundation of Agricultural Economics, Paper No. 20 (1931).

years since 1922 has ranged from $40 to $60 per ton but acreage continued to increase until 1926 and production reached its peak, 1,433,000 tons of raisin grapes and 290,000 tons of raisins, in 1938. Since 1920 there has been a substantial carry over of 30 to 50% of each year's crop. The result has been that at least since 1934 the industry, with a large increase in acreage and the attendant fall in price, has been unable to market its product and has been compelled to sell at less than parity prices and in some years at prices regarded by students of the industry as less than the cost of production.[10]

The history of the industry, at least since 1929, is a record of a continuous search for expedients which would stabilize the marketing of the raisin crop and maintain a price standard which would bring fair return to the producers.[11] It is significant of the relation of the local interest in maintaining this program to the national interest in interstate commerce, that throughout the period from 1929 until the adoption of the prorate program for

[10] Studies made under the auspices of the University of California indicate that the cost of production of Thompson Seedless raisins, including the growers' labor, a management charge, depreciation, and interest on investment, is $49.58 per ton on a farm yielding two tons per acre, and $72.07 per ton on a farm yielding one ton per acre. A two-ton yield is described as "good"; a one-ton yield as "usual." Adams, Farm Management Crop Manual, University of California Syllabus Series No. 278 (1941) 142–5. Another student has computed the cost of production at $53.96 for a two-ton per acre yield, about $65 for a 1.5 ton yield, and $90 for a one-ton yield. Shultis, Standards of Production, Labor, Material and other Costs for Selected Crops and Livestock Enterprises, University of California Extension Service (1938) 13. Field prices for Thompson Seedless raisins were below $49.50 in 1923, 1928, 1932, and 1938; since 1922 they have been at $65.00 or higher in only 5 years, and have only once been as high as $72.00. Grapes, Raisins and Wines, *supra*, 149.

For parity prices for raisins, see *supra*, note 4.

[11] For discussion of private efforts within the industry prior to 1929 to regulate the marketing of raisins, see Grapes, Raisins and Wines, *supra*, 153–5.

the 1940 raisin crop, the national government has contributed to these efforts either by its establishment of marketing programs pursuant to Act of Congress or by aiding programs sponsored by the state. Local coöperative market stabilization programs for raisins in 1929 and 1930 were approved by the Federal Farm Board which supported them with large loans.[12] In 1934 a marketing agreement for California raisins was put into effect under § 8 (2) of the Agricultural Adjustment Act of 1933, as amended, 48 Stat. 528, which authorized the Secretary of Agriculture, in order to effectuate the Act's declared policy of achieving parity prices, to enter into marketing agreements with processors, producers and others engaged in handling agricultural commodities "in the current of or in competition with, or so as to burden, obstruct, or in any way affect, interstate or foreign commerce." [13]

---

[12] See Annual Report of the Federal Farm Board (1930) 18, 73; *id.* (1931) 59–61, 91; Grapes, Raisins and Wines, *supra,* 62–64; S. W. Shear, The California Grape Control Plan, Giannini Foundation of Agricultural Economics, Paper No. 22 (1931); Stokdyk and West, The Farm Board (1930) 135–9. Loans of $4,500,000 in 1929 and $6,755,000 in 1930 were made by the Federal Farm Board. Shear, *supra,* states that the 1930 program, which provided for the formation of a single marketing agency, and the destruction or diversion to by-products use of surplus raisins, "was designed by the Federal Farm Board."

The Federal Farm Board was created by § 2 of the Agricultural Marketing Act of 1929, 46 Stat. 11, which authorized the Board to make loans to coöperative associations to aid in "the effective merchandising of agricultural commodities . . ." (§ 7) so as to achieve the statutory objective of placing agriculture on a "basis of economic equality with other industries" (§ 1).

[13] See U. S. Dept. of Agriculture, Agricultural Adjustment in 1934, 202. The marketing program adopted is published by the Agricultural Adjustment Administration, Department of Agriculture, as Marketing Agreement Series—Agreement No. 44, License Series—License No. 55. It was in effect from May 29, 1934 to Sept. 14, 1935. The agreement provided for the creation of a control board on which representatives of packers and growers should have an equal voice. Subject to the approval of the Secretary of Agriculture the control board could fix

Raisin Proration Zone No. 1 was organized in the latter part of 1937. No proration program was adopted for the 1937 crop, but loans of $1,244,000 were made on raisins of that crop by the Commodity Credit Corporation.[14] In aid of a proration program adopted under the California Act for the 1938 crop, a substantial part of that crop was pledged to the Commodity Credit Corporation as security for a loan of $2,688,000, and was ultimately sold to the Federal Surplus Commodities Corporation for relief distribution.[15] Substantial purchases of raisins of the 1939 crop were also made by Federal Surplus Commodities Corporation, although no proration program was adopted for that year.[16] In aid of the 1940 program, as we have already noted, the Commodity Credit Corporation made loans in excess of $5,000,000, and 33,000 tons of the raisins pledged to it were sold to the Federal Surplus Marketing Administration.[17]

---

minimum prices to be paid growers and require a percentage of the crop to be delivered to the control board. 15% of the 1934 crop was required to be delivered to the board, and prices for that crop were fixed at $60, $65 and $70 per ton for Muscat, Sultana, and Thompson Seedless raisins respectively.

[14] Report of the President of the Commodity Credit Corporation (1940) 16. These raisins were ultimately sold to the Federal Surplus Commodities Corporation for relief distribution. *Ibid.;* Report of the Federal Surplus Commodities Corporation (1938) 16.

[15] Report of the President of the Commodity Credit Corporation (1940) 16; Report of the Associate Administrator of the Agricultural Adjustment Administration in Charge of the Division of Marketing and Marketing Agreements, and the President of the Federal Surplus Commodities Corporation (1939) 52. The federal loan was conditioned upon the adoption of a state proration program by which 20% of the crop was delivered into a stabilization pool.

[16] Cecil, The 1940 Raisin Proration Program, *supra,* 48; Report of the Federal Surplus Commodities Corporation (1940) 6.

[17] The Commodity Credit Corporation similarly made loans on the 1937, 1938, and 1940 crops of dried prunes, the loans on the 1938 and 1940 crops being in aid of proration programs which were very similar to those adopted for raisins. Report of the President of the Commodity

This history shows clearly enough that the adoption of legislative measures to prevent the demoralization of the industry by stabilizing the marketing of the raisin crop is a matter of state as well as national concern and, in the absence of inconsistent Congressional action, is a problem whose solution is peculiarly within the province of the state. In the exercise of its power the state has adopted a measure appropriate to the end sought. The program was not aimed at nor did it discriminate against interstate commerce, although it undoubtedly affected the commerce by increasing the interstate price of raisins and curtailing interstate shipments to some undetermined extent. The effect on the commerce is not greater, and in some instances was far less, than that which this Court has held not to afford a basis for denying to the states the right to pursue a legitimate state end. Cf. *Kidd* v. *Pearson, supra; Sligh* v. *Kirkwood, supra; Champlin Refining Co.* v. *Commission, supra; South Carolina Highway Dept.* v. *Barnwell Bros., supra,* and cases cited at p. 189 and notes 4 and 5; *California* v. *Thompson, supra,* 113–15, and cases cited.

In comparing the relative weights of the conflicting local and national interests involved, it is significant that Congress, by its agricultural legislation, has recognized the distressed condition of much of the agricultural production of the United States, and has authorized marketing procedures, substantially like the California prorate program, for stabilizing the marketing of agricultural products. Acting under this legislation the Secretary of Agriculture has established a large number of market stabilization programs for agricultural commodities moving in interstate commerce in various parts of the country, including seven affecting California crops.[18] All involved at-

Credit Corporation (1940) 15, 21; *id.* (1941) 13–14, 21; Report of the Surplus Marketing Administration (1941) 33–4.

[18] Twenty-eight such programs affecting milk, and nineteen affecting other agricultural commodities, were in effect during the fiscal year

tempts in one way or another to prevent over-production of agricultural products and excessive competition in marketing them, with price stabilization as the ultimate objective. Most if not all had a like effect in restricting shipments and raising or maintaining prices of agricultural commodities moving in interstate commerce.

It thus appears that whatever effect the operation of the California program may have on interstate commerce, it is one which it has been the policy of Congress to aid and encourage through federal agencies in conformity to the Agricultural Marketing Agreement Act, and § 302 of the Agricultural Adjustment Act. Nor is the effect on the commerce greater than or substantially different in kind from that contemplated by the stabilization programs authorized by federal statutes. As we have seen, the Agricultural Marketing Agreement Act is applicable to raisins only on the direction of the Secretary of Agriculture who, instead of establishing a federal program has, as the statute authorizes, coöperated in promoting the state program and aided it by substantial federal loans. Hence we cannot say that the effect of the state program on interstate commerce is one which conflicts with Congressional policy or is such as to preclude the state from this exercise of its reserved power to regulate domestic agricultural production.

We conclude that the California prorate program for the 1940 raisin crop is a regulation of state industry of local concern which, in all the circumstances of this case which we have detailed, does not impair national control over the commerce in a manner or to a degree forbidden by the Constitution.

*Reversed.*

ending June 30, 1941. Report of the Surplus Marketing Administration (1941) pp. 7, 12. For discussions of the nature and purpose of these programs, see the annual reports of the Agricultural Adjustment Administration; Nourse, Marketing Agreements under the A. A. A. (1935).