**MIDWEST CONSTRUCTION
CO., Plaintiff,**

v.

**ILLINOIS DEPARTMENT OF LABOR,
et al., Defendants.**

**No. 88 C 957.**

United States District Court,
N.D. Illinois, E.D.

May 18, 1988.

---

Gerard C. Smetana and David G. Duggan, Abramson & Fox, Chicago, Ill., for plaintiff.

Moshe Jacobius and William K. Kane, Asst. Attys. Gen., Chicago, Ill., for State defendants.

Louis Sigman, Chicago, Ill., Baum and Sigman, defendant Local 150.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Defendants Illinois Department of Labor, Gwen R. Martin, David S. Hayes, David S. Hubbs, Illinois Capital Development Board, Gary Skoien, Myron Vangeison (collectively the "State defendants") and the International Union of Operating Engineers Local No. 150 ("Local 150") move to dismiss the complaint of Midwest Construction Company ("Midwest") pursuant to Rule 12 of the Federal Rules of Civil Procedure.

### Background

This putative antitrust action arises in connection with the State of Illinois' construction of the North Point Marina project (the "project") in Lake County. The project was to be constructed in three phases: 1) Phase I: the construction of two breakwaters and the dredging of the harbor; 2) Phase II: the installation of docks and marina facilities; and 3) Phase III: landside improvements, including pavement of a parking lot. Midwest was the successful bidder on Phase I of the project. In July 1986, Midwest entered into a construction contract with the Capital Development Board,[1] the state agency responsible for public works projects in Illinois.

In connection with its construction of Phase I, Midwest alleges that the State defendants and Local 150 engaged in two conspiracies in violation of federal antitrust laws.[2] First, Midwest claims that the Department of Labor and Local 150 conspired to enforce the Employment of Illinois Workers on Public Works Projects Act (the "preference law"), Ill.Rev.Stat. ch. 48, ¶¶ 2201 *et seq.* (1986), discriminatorily against out-of-state and non-union contractors. The preference law authorizes the employment of only Illinois laborers on public works projects or improvements for

---

1. The Capital Development Board consists of seven members who are appointed by the Governor with the consent of the Senate. Ill.Rev. Stat. ch. 127, ¶ 775. Members serve without compensation. Ill.Rev.Stat. ch. 127, ¶ 776.

2. Although the complaint merely refers to violations of "the antitrust laws," the court assumes that Midwest is attempting to state claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

the State of Illinois during periods of excessive unemployment. Ill.Rev.Stat. ch. 48, ¶ 2203. The Department of Labor is empowered to enforce the preference law by suing for injunctive relief against the award of any public works contract or the continuation of any work when the requirements of the preference law are not met. Ill.Rev.Stat. ch. 48, ¶ 2207.

Midwest claims that pursuant to complaints by Local 150, the Department of Labor began investigating Midwest for violations of the preference law. In June or July 1987, the Department of Labor allegedly advised two of Midwest's subcontractors that they were not in compliance with the preference law because certain employees were not Illinois laborers. As a result, Midwest was forced to stop work on the project. Another judge of this court later entered a temporary restraining order preventing the State defendants from enforcing the preference law. *See E & E Construction Co., et al. v. State of Illinois, Department of Labor, et al.,* No. 87 C 6289 (N.D.Ill. July 21, 1987, Shadur, J.) [available on WESTLAW, 1987 WL 46917].[3] After the order expired, the parties entered into a standstill agreement; the State defendants agreed not to enforce the preference law. The anticompetitive activities at issue in this litigation occurred prior to the entry of the temporary restraining order.

In a second conspiracy, Local 150 allegedly combined with the Department of Labor and the Capital Development Board to prevent Midwest from being awarded Phase II of the project. Midwest maintains that in June 1987, it submitted the lowest bid on Phase II, and that the bid was approved by the Capital Development Board. Complaint ¶¶ 31, 33. In July 1987, the Capital Development Board advised

Midwest that all bids received had been rejected and that the project would be advertised at a later date. Complaint, ¶ 51. In November 1987, the Capital Development Board rebid the project and allegedly approved the bid submitted by a rival company. Midwest further alleges that the Capital Development Board has failed to pay Midwest for its work on Phase I since July 1987. Complaint ¶¶ 64, 68–69. Midwest filed this action against the Department of Labor, Capital Development Board, five employees of the state agencies and Local 150 alleging antitrust and state contract law violations. Midwest seeks injunctive relief, compensatory damages, treble damages for the antitrust violations and lost profits.

The State defendants move to dismiss the complaint on the ground that the state is immune from suit under federal antitrust laws.[4] Local 150 moves to dismiss on the ground that its actions are exempt from the antitrust laws. For the reasons that follow, defendants' motions to dismiss are granted.

### Discussion

In considering a motion to dismiss, the court accepts all well pleaded facts as true but is not bound by the legal characterizations that the plaintiff attributes to the facts. *Republic Steel Corp. v. Pennsylvania Engineering Corp.,* 785 F.2d 174, 182–83 (7th Cir.1986). The complaint will be dismissed where plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

### I. The State Defendants' Motion to Dismiss

The State defendants maintain that they are shielded from antitrust liability by the

---

**3.** In *E & E Construction,* Midwest joined two of its subcontractors (the targets of preference law enforcement) to challenge the constitutionality of the preference law. Midwest's challenge to the constitutional validity of the statute does not affect the propriety of the State defendants' good faith attempts to enforce the law. *Younger v. Harris,* 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1971) (the possible unconstitu.ionality of a statute "on its face" does not itself

justify an injunction against good faith attempts to enforce it).

**4.** They also contend that actions against the state are barred by the Eleventh Amendment, that the complaint fails to plead the required elements of a conspiracy or state a contract law claim, and that this court should abstain from hearing this matter because Illinois' administration of the Illinois preference law is a matter of local concern.

state action doctrine established in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. They claim that they are entitled to sovereign immunity because the Department of Labor was acting pursuant to its duty to enforce the Illinois preference law, and the Capital Development Board was acting as the state agency responsible for overseeing the construction of public works in Illinois. In the alternative, they contend that they are entitled to the immunity that protects municipalities in the implementation of a clearly articulated policy of the state.

Midwest argues that in building the project, the State is acting in a commercial capacity as a market participant and, therefore, the State defendants cannot claim sovereign immunity. Rejecting the argument that the State defendants were merely implementing state policy, Midwest contends that they engaged in a conspiracy with Local 150 to exclude Midwest from the marketplace, in violation of the antitrust laws.

■ In *Parker, supra,* the Supreme Court acknowledged that certain state and state-mandated actions may be exempt from the proscriptions of the Sherman Act. Acts of the state legislature and of the state's highest court are deemed acts of the state in its sovereign capacity and, therefore, are exempt from federal antitrust scrutiny. *See* 317 U.S. at 351–52, 63 S.Ct. at 313–14; *Bates v. State Bar of Arizona,* 433 U.S. 350, 359–63, 97 S.Ct. 2691, 2696–98, 53 L.Ed.2d 810 (1977). A state agency, municipality or other state subdivision must show that it was acting pursuant to a "clearly articulated and affirmatively expressed state policy." [5] *Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984).

■ A state policy need not compel specific conduct to be "clearly articulated." *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 61 (1985). It is deemed to include all conduct that is shown to be a foreseeable consequence of state legislation. *Hallie, supra,* 471 U.S. 34, 44, 105 S.Ct. 1713, 1719. The state action exemption shields the state and its representatives regardless of whether the state is engaged in governmental or commercial activities. *See Limeco, Inc. v. Division of Lime,* 778 F.2d 1086, 1087 (5th Dist.1985) (a commercial activities exception to the *Parker* doctrine requires a showing that Congress intended to exempt only certain state functions from the Sherman Act); *In re Airport Car Rental Antitrust Litigation,* 693 F.2d 84, 88 (9th Cir. 1982), *cert. denied,* 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983) (no commercial exception).

■ In this case, the State defendants did not act for the state itself. Both the Department of Labor and the Capital Development Board are created by state statute and exercise governmental power. These agencies have a significant amount of independence in carrying out their governmental role. Therefore, neither the Department of Labor nor the Capital Development Board was acting in a sovereign capacity. *See Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.,* 790 F.2d 1032, 1044 (2d Cir.1986) (finding that the urban development corporation created by state statute did not act in the state's sovereign capacity).

Because the Department of Labor and the Capital Development Board are not the sovereign, they must show that the alleged anticompetitive conduct was taken pursuant to a clearly articulated state policy to be entitled to the state action defense. The

---

**5.** In *California Retail Liquor Dealers Assn. v. MidCal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Supreme Court articulated a two-pronged test for determining whether state regulation of private parties is shielded from the antitrust laws: (1) the challenged conduct must be "clearly articulated and affirmatively expressed as state policy," and (2) the conduct must be actively supervised by the state. 445 U.S. at 105, 100 S.Ct. at 943. Subse-

quently, the Court determined that the second prong of the *MidCal* test is inapplicable to municipalities; a municipality need not be supervised by the state in order to qualify for state immunity. *See Hallie v. Eau Claire,* 471 U.S. 34, 46, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985). In *Hallie,* the Court also noted the likelihood that the state supervision requirement would not be required where the actor is a state agency. *Id.* n. 10.

legislature expressly authorized the Department of Labor to enforce the preference law. By its terms, the preference law orders the Capital Development Board to "employ only Illinois laborers" on public works projects during periods of excessive unemployment. Ill.Rev.Stat. ch. 48 ¶ 2203. The Department of Labor may "sue for injunctive relief against the awarding of any contract or the continuation of any work under contract for public works or improvement" for the employment of non-Illinois laborers at a time when only Illinois laborers are to be used. Ill.Rev.Stat. ch. 48, ¶ 2203, 2207. Therefore, the legislature expressly empowered the Department of Labor to prevent companies that employ non-Illinois laborers from obtaining or completing public works contracts.

Similarly, the legislature granted the Capital Development Board broad authority "(t)o provide for the acquisition, planning, construction, reconstruction, improvement and installation of capital facilities ..., as authorized by the General Assembly...." Ill.Rev.Stat. ch. 127, ¶ 779.01. The Capital Development Board is authorized to enter into contracts on behalf of the State and "[t]o exercise all other powers necessary or desirable to accomplish the purposes of [the Capital Development Board] Act and to the performance of its duties under [the] Act." Ill.Rev.Stat. ch. 127, ¶¶ 779.02, 779.08. A suit against the Capital Development Board or its officers in connection with state matters is, in effect, a suit against the State. *J.L. Simmons Company, Inc. v. Capital Development Board*, 98 Ill.App.3d 445, 54 Ill.Dec. 71, 72, 424 N.E.2d 821, 822 (4th Dist.1981).

Since the legislature authorized the Capital Development Board to create public works contracts, and empowered the Department of Labor to monitor the hiring of laborers in connection with such contracts, it was implicit that the Department of Labor and the Capital Development Board would work in cooperation with each other. The complaint contains no factual allegations to suggest that the State defendants' conduct exceeded their legislatively mandated duties and responsibilities. Midwest's allegations concerning conspiracies among the defendants are insufficient to deprive the State defendants of immunity as state representatives. Accordingly, the State defendants' motion to dismiss the complaint is granted.

## II. Local 150's Motion to Dismiss

Local 150 moves to dismiss on the ground that the union activities alleged are exempt from the antitrust laws. Specifically, Local 150 asserts that it acted in the course of a legitimate union organization campaign—a legitimate objective of organized labor favored by federal labor policy. It also asserts that federal law exempts labor organizations and their activities from the reach of the antitrust laws. Finally, Local 150 claims that its efforts to influence the State defendants and the Governor in the investigation of Midwest's employment practices are exempt from attack pursuant to the *Noerr–Pennington* doctrine, which protects private efforts to influence public officials to take lawful action.

Midwest maintains that Local 150 is not exempt from the antitrust laws. It contends that Local 150 is not entitled to immunity for its organization of Midwest's employees because the effort was merely an attempt to legitimize prior anticompetitive conduct. Midwest charges that Local 150's activities exceeded the bounds of the *Noerr–Pennington* exemption because Local 150 and its unnamed co-conspirators engaged in conduct designed to exclude Midwest from the market, rather than merely to induce the State defendants to take lawful action. *Id.* at 21–28.

In *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court recognized an exemption from the antitrust laws for group solicitation of government action. In *Noerr Motor Freight,* the Court held that the Sherman Act did not apply to a malicious lobbying effort by an association of railroads seeking legislation that would restrict competition from the trucking industry. *Noerr Motor Freight, supra,* 365 U.S. at 133, 81 S.Ct. at 527. In *Penning-*

*ton*, the exemption was extended to include attempts to influence government administrative processes as well as legislative efforts. *Pennington, supra*, 381 U.S. at 670, 85 S.Ct. at 1593. There, plaintiff alleged antitrust violations in connection with concerted efforts by coal mine operators and a union to persuade the Secretary of Labor to establish higher minimum wages for workers supplying coal to the Tennessee Valley Authority. In ruling that such concerted activity was exempt from the Sherman Act, the Court noted:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

*Id.*

■■■ In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972), the Court acknowledged the "sham" exception to the *Noerr–Pennington* doctrine. Where a defendant engages in a pattern of baseless, repetitive claims designed to interfere directly with the business relationships of a competitor through harassment, *Noerr–Pennington* will not protect the defendant from antitrust liability. *MCI Communications v. American Telephone & Telegraph Company*, 708 F.2d 1081, 1156 (7th Cir.) *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (deliberately bringing administrative actions with the knowledge that the agencies involved lacked the authority to take the desired action constitutes sham activity). The intention to harm a competitor alone does not render conduct a sham because anticompetitive motive is the very matter protected by *Noerr–Pennington. Winterland Concessions Co. v. Trela*, 735 F.2d 257, 262–64 (7th Cir.1984). Rather, the sham exception is based upon a defendant's intent to harm its competitors not by the result of the litigation, but by the insti-

tution of the claim. *Id.* If the injury flows directly from the petitioning of government officials—if the anticompetitive injury occurs regardless of how the government responds—the conduct is a sham and an antitrust claim exists. *Premier Electrical Constructon Co. v. National Electrical Contractors Association, Inc.*, 814 F.2d 358, 376 (7th Cir.1987).

■■■ Local 150's efforts to influence the State defendants are exempt from antitrust liability under the *Noerr–Pennington* doctrine and cannot be characterized as a sham. Despite its obviously anticompetitive motive, Local 150 sought to induce lawful governmental action. Both the Department of Labor and the Capital Development Board are empowered to conduct investigations into the hiring of laborers and the construction of public works projects. Midwest's alleged injury arose in connection with the Department of Labor's enforcement of the preference law and the Capital Development Board's lawful decision to reject all Phase II bids and to rebid the project. Because the state action was legitimate (despite the resulting anticompetitive effects), Local 150's efforts to influence the State defendants are exempt.[6] To the extent that Midwest attempts to allege that Local 150 induced unnamed private entities to drive Midwest out of the market, its conclusory allegations are insufficient to state a claim for conspiracy under the antitrust laws. Accordingly, Local 150's motion to dismiss the complaint is granted.

### III. State Law Contract Claims

In addition to its antitrust claims, Midwest alleges contract law violations arising from the rejection of its bid on Phase II of the project. Because the antitrust claims will be dismissed as to both the State defendants and Local 150, the pendent state claims shall be dismissed as well. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

**6.** The *Parker* state action defense and the *Noerr–Pennington* exemption are interrelated. As one court noted,

> It would be anomalous to hold ... that government can contract with private entities to effect valid, albeit anticompetitive, policies,

while holding ... that private entities cannot petition government to participate in the public endeavor.

*Independent Taxicab Drivers' Employees v. Greater Houston Transportation Company*, 760 F.2d 607, 613 (5th Cir.1985).

## CONCLUSION

The Illinois legislature authorized the Capital Development Board to control the construction of public works projects in Illinois and directed that only Illinois laborers be employed on public works projects during periods of excessive unemployment. The legislature empowered the Department of Labor to regulate the employment of Illinois laborers for public projects. The preference law clearly articulates and affirmatively expresses a State policy to employ Illinois laborers on public projects; the anticompetitive results of such selective employment were clearly foreseeable. Therefore, the Capital Development Board and the Department of Labor are immune from antitrust liability. Further, Local 150's efforts to influence the State defendants in the performance of their duties are exempt from antitrust liability under the *Noerr–Pennington* doctrine. The motions to dismiss are granted, and the complaint is dismissed with prejudice and without costs.