Justice Stevens,
concurring in the judgment.
When investment bankers cooperate in underwriting an initial public offering (IPO), they increase the amount of capital available to firms producing goods and services and make additional securities available for purchase. By agglomerating networks of investors and spreading the risk of overvaluation, syndicates make positive contributions to the economy that could not be achieved through independent action. See 426 F. 3d 130, 137-138 (CA2 2005). In my view, agreements *286 among underwriters on how best to market IPOs, including agreements on price and other terms of sale to initial investors, should be treated as procompetitive joint ventures for purposes of antitrust analysis. In all but the rarest of eases, they cannot be conspiracies in restraint of trade within the meaning of § 1 of the Sherman Act, 15 U. S. C. § 1.
After the initial purchase, the prices of newly issued stocks or bonds are determined by competition among the vast multitude of other securities traded in a free market. To suggest that an underwriting syndicate can restrain trade in that market by manipulating the terms of IPOs is frivolous. See United States v. Morgan, 118 F. Supp. 621, 689 (SDNY 1953) (Medina, J.) (“[T]he syndicate system has no effect whatever on general market prices, nor do the participating underwriters and dealers intend it to have any. On the contrary, it is the general market prices of securities of comparable rating and quality which control the public offering price .... The particular issue, even if a large one, is but an infinitesimal unit of trade in the ocean of security issues running into the billions, which constitutes the general market”); see also Hovenkamp, Antitrust Violations in Securities Markets, 28 J. Corp. L. 607, 615-618 (2003). It is possible, of course, that the practices described in the complaints in these two cases may have enabled the underwriters to divert some of the benefits of the offerings from the issuers to themselves, thus breaching the agents’ fiduciary obligations to their principals. But if such an injury did occur, it is not an “antitrust injury” giving rise to a damages claim by investors. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U. S. 477, 489 (1977).
Nor do I believe that the so-called “laddering” and “tying” described in the complaints constitute vertical restraints that violate either the Sherman Act or §2(c) of the Robinson-Patman Act, 15 U. S. C. § 13(c). Given the magnitude of the market these practices are alleged to have influenced, I think it obvious as a matter of law that there has *287 been no injury to any relevant competition. Unlike in Bell Atlantic Corp. v. Twombly, 550 U. S. 544 (2007), there is no need to engage in discovery to determine whether there is any merit to the plaintiffs’ claims. See id., at 593-595 (Stevens, J., dissenting).
The defendants moved to dismiss for failure to state a claim on the ground, among others, that the plaintiffs’ claims challenge “the ordinary activities of participants in underwriting syndicates, which aré recognized to be completely lawful and pro-competitive.” Record, Doc. 98, p. 72. I agree and would hold, as we did in Parker v. Brown, 317 U. S. 341, 351-352 (1943), that the defendants’ alleged conduct does not violate the antitrust laws, rather than holding that Congress has implicitly granted them immunity from those laws. Surely I would not suggest, as the Court did in Twombly, and as it does again today, that either the burdens of antitrust litigation or the risk “that antitrust courts are likely to make unusually serious mistakes,” ante, at 282, should play any role in the analysis of the question of law presented in a case such as this.
Accordingly, I concur in the Court’s judgment but not in its opinion.