Lawrence CANTOR, d/b/a Selden Drugs Co., Individually and on behalf of all other retail sellers of light bulbs similarly situated, Plaintiffs,

v.

The DETROIT EDISON COMPANY, a Michigan Corporation, Defendant.

Civ. A. No. 4–70026.

United States District Court, E. D. Michigan, S. D.

April 30, 1980.

David L. Nelson, Southfield, Mich., Burton I. Weinstein, Robert A. Holstein, Michael L. Sklar, William J. Harte, Chicago, Ill., for plaintiffs.

Leon S. Cohan, Jane K. Souris, Detroit, Mich., George D. Reycraft, Cadwalader, Wickersham & Taft, New York City, for defendant.

FEIKENS, Chief Judge.

### OPINION AS TO ATTORNEY FEE AWARD

Attorneys for the plaintiff class in this antitrust suit petition for an award of attorney's fees.

*Background*

Although portions of the proceedings have been described elsewhere (*Cantor v. Detroit Edison*, D.C., 392 F.Supp. 1110; *Cantor v. Detroit Edison*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141), the history of this case is described in some detail for purposes of this fee petition.

Suit was filed on July 6, 1973. The complaint alleged that defendant through its program of supplying light bulbs to its customers without charge, and of costing out that program through its general rate schedule, violated federal antitrust laws. Defendant answered that its rates and programs generally, and the light bulb program specifically, were subject to the approval and supervision of the Michigan Public Service Commission ("MPSC") and, therefore, within the "state action" exemption to the antitrust laws in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). On defendant's motion for summary judgment, in connection with which the parties stipulated that the single issue presented was the applicability of *Parker*, I held that the case fell squarely within *Parker* and granted summary judgment. 392 F.Supp. at 1112 (1974).

On appeal the United States Court of Appeals for the Sixth Circuit affirmed without opinion. 513 F.2d 630 (1975). The United States Supreme Court granted a writ of certiorari, and after submission of briefs and oral argument, held that the *Parker* doctrine did not apply to defendant's light bulb program and reversed my holding. 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1975).

The Supreme Court remanded the case to this court for resolution of the issue whether defendant had violated the antitrust laws

in its light bulb program. The parties then initiated settlement negotiations and reached a tentative agreement on July 1, 1977. The settlement was reduced to writing in a Stipulation of Settlement filed with this court on October 28, 1977. On November 4, 1977, I entered an order certifying a class action, and providing for notice and a hearing to class members on the proposed settlement. The class was defined as "all retail sellers who are engaged or were engaged in the business of selling incandescent light bulbs in competition with the defendant." The Stipulation of Settlement provided, *inter alia*, that defendant was to be enjoined from distributing light bulbs except on a competitive retail sales price basis, and that plaintiff class would withdraw all demands for monetary relief.

The hearing on the proposed settlement was held February 22, 1978. Out of over 26,000 potential class members, eight opted out and none objected to the settlement. Prior to the hearing, however, three law students from Wayne State University Law School and the Corporation Counsel for the City of Detroit sought status as intervenors in order to object to the discontinuance of the no-charge light bulb program. I denied their motions to intervene; one of the parties then filed a motion for stay of execution of the settlement pending appeal of my denial of the motion to intervene. I also denied a stay of proceedings and on appeal of that order the United States Court of Appeals for the Sixth Circuit affirmed. In an opinion issued April 13, 1978, I approved the settlement agreement as contained in the Stipulation of Settlement, holding that "balancing all the interests involved, the public interest as well, I find the settlement proposed by the parties realistically provides an intelligent compromise." [1]

---

1. I wrote in my opinion of April 14, 1978 that the Supreme Court's ruling in the case had made compromise a reasonable solution for all concerned in the case.

 "In view of the Supreme Court's clear holding I must approve the settlement proposed by the parties. The opinion in *Cantor* has created, in Justice Stewart's words of dissent, 'the prospect of massive treble damage liabilities' payable ultimately by the custom-

ers of regulated utilities. Neither the parties, the proposed intervenors, nor this court can quantify precisely the degree of risk to which Detroit Edison would expose itself should it decide to litigate this matter. Neither the argument that the risk is minimal because of a belief that Detroit Edison can win the antitrust suit nor the argument that the anti-trust laws are being misused by plaintiffs and their counsel can be given great weight in view of

On May 31, 1978, the Michigan Public Service Commission ("MPSC") filed motions to intervene, for relief from judgment, and for stay of judgment. Prior to May 31, the MPSC had denied defendant's application to discontinue the light bulb program and held hearings on a proposed statewide lamp exchange program. In response plaintiff moved to enjoin the MPSC from interfering with the settlement and judgment. I granted MPSC's motion to intervene in the suit, denied the motion for relief from judgment, and denied plaintiff's motion for injunctive relief. Eventually, MPSC declined to proceed further in opposition to the opposed settlement.

By this time a question had been raised as to the possible solicitation of the case by plaintiff's Illinois attorneys. In *in camera* proceedings the Michigan State Bar Grievance Board and the Illinois Registration and Disciplinary Commission, after conducting a joint investigation which I had requested reported also *in camera* to me on March 8, 1979 on this ethics question and cleared the attorneys of all charges of wrongdoing. Proceedings on the matter of attorneys' fees had been delayed while the MPSC proceedings and ethics investigation were ongoing.

Plaintiff's attorneys' ("petitioners")[2] petition for fees and costs was filed on June 11, 1979. An evidentiary hearing was held on December 12, 13, 14 and 19, 1979, and final arguments were presented on February 12, 1980. The matter is now before me for decision.

### Applicable Standards

The settlement agreement specifically authorizes an award to petitioners of fair and reasonable attorneys' fees to be paid for by defendant. Paragraph 10 of the settlement agreement provides:

"Defendant agrees that it will advise the Court that it does not object to the allowance of $690,000.00 as attorneys' fees for services rendered prior to July 1, 1977 on behalf of the plaintiff in connection with the prosecution and settlement of this action. It is further agreed that plaintiff's attorneys may make an application to the Court for an amount in excess of the sum of $690,000.00 as an allowance of plaintiff's attorneys' fees for the above mentioned services. Plaintiff's attorneys have stated that they will base such application on judicial standards and precedents for the award of attorneys' fees, taking into consideration the amount of time expended, the degree of difficulty of the task, the risks of the litigation, the benefits conferred on the plaintiff-class and such other factors as apply under such precedents, provided however, that such application shall not request a fee in excess of $1,575,000.00 which is based upon 3600 hours of attorneys' time, an hourly rate of $125.00 per hour and a multiplier of 3½.

"Detroit Edison, while it will vigorously contest the allowance of any such fees in excess of $690,000.00, agrees to pay such plaintiff's attorneys' fees as approved by the Court as fair and reasonable for such services. In addition, Detroit Edison agrees to pay plaintiff's reasonable attorneys' fees for necessary services rendered and to be rendered in connection with the settlement of this case after June 30, 1977 as approved by the Court. In addition to the aforesaid, Detroit Edison agrees to reimburse plaintiff's attorneys

---

the Supreme Court's opinion. The existence of the risk, because of the large potential of treble damage liability, provides sufficient justification for me to approve the proposed settlement.

"The settlement, by imposing prospective injunctive relief only, protects Detroit Edison, its shareholders and those members of the public to whom it provides service, from paying a potentially large treble damage claim either now or in the future. It also allows plaintiff class members, for the first time, to

compete openly and equally for the light bulb market in the Detroit Edison marketing area. Furthermore, in view of the Supreme Court's opinion, the settlement spares both parties the time and expense of protracted litigation in this complex case."

2. Petitioners here are the four principal attorneys throughout the history of plaintiff's suit: Michael Sklar, Robert Holstein, Burton Weinstein, and David Nelson.

for their actual out-of-pocket expenses, as approved by the Court.

"However, Detroit Edison will not pay legal fees for the time spent by plaintiff's attorneys in connection with the preparation, presentation and support of plaintiff's attorneys' petition for fees or any appeal related thereto."

■ Petitioners suggest that authorization for an award of attorneys' fees in this case can also be based on the court's general equity jurisdiction and on 1976 amendments to the Clayton Act. Courts have frequently authorized an award of attorneys' fees in antitrust class actions in which the settlement produced monetary relief for the class, e. g. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). Under this so-called "equitable fund doctrine" attorneys' fees are awarded on the principle that "the members of the group should pay 'compensation as was reasonable' above and beyond reimbursement for out-of-pocket expense to the attorney representing their interests." *Grinnell*, at 469. Less frequent are awards where the settlement agreement produces injunctive and prospective relief, although a few courts have granted fees based on a similar equitable power.[3] Another source of authorization for attorneys' fees is statutory. Until 1976, the Clayton Act authorized the award of attorneys' fees only where the case went to trial and monetary relief was granted. Under the 1976 amendments attorneys' fees are now authorized in private antitrust cases where plaintiff "substantially prevails" and injunctive relief only is granted. 15 U.S.C. § 26. Application of the statute, particularly in a case which is settled by the parties, would require a finding that plaintiff had in fact "substantially prevailed."

■ In addition to the possible use of these sources for authorization of attorneys' fees awards, here attorneys' fees are authorized by the settlement agreement. This is significant. While cases in which the fee award is authorized by the court's equity power or by statute may be useful in determining the applicable standard, the settlement agreement is the first document which must be considered. As I noted at the hearing in this matter, this construction is consistent with requirements of Rule 23(e), Federal Rules of Civil Procedure.[4] (December 12 Tr. 28.)

■ But the settlement agreement is not entirely controlling. In reviewing the petition for attorneys' fees as directed by the settlement agreement and Rule 23(e), F.R. Civ.P., I am required also to "act[ ] as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975). Close judicial scrutiny of attorney's fee awards is likewise mandated by the large body of case law which has developed in the past decade. The concern of the courts in these cases was stated by the United States Court of Appeals for the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d at 469 (2nd Cir. 1974):

"The practice of awarding attorneys' fees is one that has been 'delicate, embarrassing and disturbing' for the courts. . . This embarrassment is rooted in the fact that 'the bitterest complaints [about the legal profession] from laymen [are directed at] the windfall fees and featherbedding that lawyers have managed to perpetuate through . . . their influence with the judiciary' . . . 'If Rule 23 is to be preserved against deserved criticism, some attempt must be made by the court to suit the award of the fees to the performance of the individual counsel in light of the size of the

---

**3.** For the history of attorneys' fees awards, *see* the *Memorandum and Order, Report of Folding Carton Fee Comm. and Recommendations on Attorneys' Fees and Expenses in the Matter of In Re Folding Carton Antitrust Litigation*, Dkt. No. 4–70026 (N.D.Ill.1979) (hereafter *"In Re Folding Carton Fee "*).

**4.** Rule 23(e) states,

"A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

settlement. Otherwise, the attorneys who are taking advantage of class actions to obtain lucrative fees will find themselves vulnerable to the criticism expressed in the Italian proverb, "A lawsuit is a fruit tree planted in a lawyer's garden," ' . . . For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so."

█ The perception of the public when it views the position of the lawyers and the judges in a fee situation is particularly important where, as here, members of the plaintiff class have received no monetary award. Such a situation may also be seen as giving rise to a question of conflict of interest. For it might be perceived that attorneys who receive a substantial fee award while their clients, the members of the class, receive no monetary award may not have completely considered their clients' interests.

█ I am satisfied that in this case any possible conflict of interest problem was met by a full disclosure in the notice of settlement that went to members of the class as to the amount of fees being claimed by petitioners. In addition proceedings on the attorneys' fees were held only after the settlement was entered. As to the matter of the public perception of such an attorney fee award, the court best handles this by a careful analysis of the fee petition, the utilization of the adversary process, an extensive hearing, and a detailed investigation followed by an opinion containing specific findings and conclusions.

Numerous appellate and district court decisions in the past decade have considerably developed and refined the standards to be applied. Although there is now general agreement on the approach to be taken and the criteria to be applied in determining a reasonable fee, *see In Re Equity Corp. of America Securities*, 438 F.Supp. 1303, 1326 (C.D.Calif.1977), some differences among the circuits remain.[5] In the Sixth Circuit the two most recent decisions of the Court of Appeals are *Oliver v. Kalamazoo Board of Education*, 576 F.2d 714 (6th Cir. 1978), and *Northcross, et al. v. Memphis Board of Education*, 611 F.2d 624 (6th Cir., decided 1979). Although they are school desegregation cases rather than antitrust cases, the standards announced in *Oliver* and *Northcross* are applicable here. In *Northcross* the Court of Appeals, in discussing the legislative history of the Civil Rights Attorney's Fees Awards Act of 1976, by which the award in *Northcross* was authorized, stated,

"Furthermore, Congress gave some express guidance as to the standards to be used by the courts in the mechanical calculation of the amount of fees to be awarded. The amount of fees is to be governed 'by the same standards which prevail in other types of equally complex Federal litigation, *such as antitrust cases.*'" 611 F.2d 624, at 633. (Emphasis added.)

The Court of Appeals has also noted in school desegregation cases that the fee award is paid out of the public treasury. *Northcross, supra*, at 643 (concurring and dissenting opinion, J. Weick). ("The funds out of which the allowance are to be paid have been exacted from local taxpayers for the needed and ever increasing expenses of the operation of the public schools"); *Oliver, supra*, at 716 (separate opinion, J. Weick). In this regard the payment of attorney fees by a regulated public utility (Detroit Edison) is similar to the payment of attorney fees in school desegregation cases. The general consumer public pays the expenses of Detroit Edison through rates set by the MPSC. Attorneys' fees awarded must be exacted from the general

---

5. In addition to the leading reported cases, I have also read three recent surveys of attorneys' fees cases: "The Report of the Folding Carton Fee Committee", a study by Professor Arthur Miller, "Attorneys Fees in Class Ac-

tions, a Study Prepared for the Federal Judicial Center," dated July, 1979, and "Attorney Fee Awards in Antitrust Class Actions," 5 Class Action Reports 334–359 (July-August, 1978).

public as part of electricity user rates. Even though petitioners argue that their fees should be paid by the stockholders of Detroit Edison, defendant has pointed out that the fee award will be presented to MPSC for approval and inclusion in a future rate.

■ In making my findings, I follow the approach taken by our Court of Appeals in *Northcross*: the fee is to be based on the number of attorney hours spent multiplied by a reasonable hourly rate. Some adjustment upward in the hourly rate may be included to reflect special factors. All calculations must be supported by "clear and adequate findings of fact on the record." *Northcross, supra*, at 636; *see also, Monroe v. County Board of Education of Madison County*, 505 F.2d 105, 109 (6th Cir. 1974). In *Northcross*, the Court of Appeals listed twelve "factors for consideration,"[6] and then stated:

> We have learned through experience, however, that merely providing a check list of factors to consider does not lead to consistent results, or, in many cases, reasonable fees . . . . We conclude that an analytical approach, grounded in the number of hours expended on the case, will take into account all the relevant factors, and will lead to a reasonable result.

■ The Sixth Circuit's approach which bases the fee primarily on the number of hours spent by attorneys rather than on the amount recovered or the benefit to the plaintiff class is particularly significant here. In this case, in which the benefit to plaintiff class may well be an enhanced market for the sale of light bulbs, that benefit is prospective and is not easily measured. The settlement agreement provides that defendant is required to cease its "free exchange of light bulbs," and that upon the effective date of its approval by entry of judgment, customers of Detroit Edison would thereafter purchase light bulbs at prevailing market prices. This is the only relief plaintiff class obtained in this lawsuit; no monetary damages are to be paid to them. There is no fund which petitioners obtained for members of the class. The attorney fee award in a literal sense is the only money changing hands. Thus a factor # 8 (*see* footnote 6) approach based on the benefit obtained for the class would be difficult to apply and might be misleading. This example gives meaning to the statement of the Court of Appeals that simple adherence to a list of factors does not necessarily result in a reasonable fee. Accordingly, I conclude that an analytical approach grounded on the number of attorney work hours expended on the case, multiplied by a reasonable hourly rate and adjusted to reflect special factors should be applied in this case.

### The Attorney Fee Award

I. The Amount of Hours Claimed and the Fee Petition

The attorney work hours for which petitioners seek compensation are set forth in the following chart.

6. "(1) The time and labor required;
(2) the novelty and difficulty of the questions;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the 'undesirability' of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases."
*Northcross, supra*, at 642.

| | For Services Through Settlement Agreement and Notice to Class [a] | Interventions and MPSC Matters | Ethics Investigation | Fee Petition | Total |
|---|---|---|---|---|---|
| Holstein | 964.4 [b] | 163.2 [b] | 54.1 [b] | 86.30 [c] | 1268.0 |
| Sklar | 1103.0 [b] | 325.3 [b] | 153.2 [b] | 279.9 [d] | 1861.4 |
| Weinstein | 828.6 [b] | 290.8 [b] | 57.8 [b] | 139.0 [n] | 1316.2 |
| Nelson | 877.7 | 160.5 | 29.5 | 122.25 [e] | 1189.95 |
| Other Attorneys from Fohrman, Lurie law firm [m] | 271.3 [f] | 5.1 [j] | 8.2 [k] | | 284.6 |
| Other Arorneys from Boehm & Weinstein law firm [m] | | 158.90 [g] | 27.6 [g] | 45.20 [g] | 234.4 |
| Other Attorneys from Sommers, Schwartz law firm [m] | 12.5 [h] | 17.0 [i] | | | 29.5 |
| Albert Sugar [m] | 140.0 [l] | | 38.5 [l] | | 178.5 |
| Total | 4197.5 | 1155.5 | 330.7 | 491.15 | 6174.85 |

[a] Hours not fully identified in time records (e. g., "Conference with Robert Holstein re strategy") are categorized based on what appears, from the dates or other time records, to be the subject discussed or researched.

[b] Based on Schedule A to Prehearing Memorandum of Attorneys for Plaintiff Class. Schedule A (as amended in Petitioners' Posthearing Brief) is based on petitioners' time records as they appear in Defendant's Exhibits 6 and 15.

[c] Affidavit of Robert A. Holstein, filed January 17, 1980.

[d] Affidavit of Michael Sklar.

[e] Affidavit of David Nelson, filed January 9, 1980.

[f] Defendant's Exhibit 10. Includes hours spent by Darryl Fohrman (6.1), Paul Lurie (16.7), Martin Dubowsky (3.6), Marc Simon (2.4), William Cottle (10.2), Letcia Valencia (184.2), and Shari Shapiro (48.1).

[g] Defendant's Exhibit 6, Subpart E; Affidavit of Burton Weinstein submitted as part of Plaintiff's Exhibit 15. Hours of Richard Siegel.

[h] Defendant's Exhibit 6. Hours of Elaine Grand.

[i] Defendant's Exhibit 6. Hours of Roger Leemis.

[j] Defendant's Exhibit 10. Includes hours spent by Paul Lurie (1.0), Martin Dubowsky (1.8), Shari Shapiro (2.0).

[k] Defendant's Exhibit 10. Includes hours spent by Darryl Fohrman (1.1), Paul Lurie (1.6), Martin Dubowsky (2.0), Marc Simon (.4), Shari Shapiro (3.4).

[l] Defendant's Exhibit 6, p. 3. Albert Sugar's hours are totally reconstructed. The 38.5 hours include some hours finishing the settlement, some hours on the MPSC and intervention matters, and some hours spent on the ethics investigation.

[m] The Fohrman, Lurie firm is Sklar's present firm.
The Boehm & Weinstein firm is Weinstein's present firm.
The Sommers, Schwartz firm is Nelson's present firm.
Albert Sugar is a retired partner (of counsel) of the Sommers, Schwartz firm.

[n] Affidavit of Weinstein submitted as part of Plaintiff's Exhibit 15.

## II. Effect of the Settlement Agreement

While the settlement agreement clearly authorizes the award of plaintiff's attorneys' fees for both pre-July 1, 1977 and post-July 1, 1977 services, the effect on the amount of the award because of certain language in the agreement is disputed by the parties.

The settlement agreement, paragraph 10, states in part:

Defendant agrees that it will advise the Court that it does not object to the allowance of $690,000.00 as attorneys' fees for services rendered prior to July 1, 1977.

Initially, petitioners argued that this language precluded defendant from objecting to the entire fee petition. They argued that only amounts in the petition in excess of $690,000 for pre-July 1, 1977 services could be opposed without violating the agreement. (December 12 Tr. 231.) In final argument, petitioners took the position that while defendants could oppose an award of less than $690,000, the fact that defendant had agreed to that amount at the time of settlement was an admission by defendant of its reasonableness.

The settlement agreement clearly contemplates that, if petitioners had sought an award of less than $690,000 for services rendered prior to July 1, 1977, defendant would not oppose it. Defendant agreed at the hearing that that remained its position. (December 12 Tr. 27.) Even if that were the case, of course, I would still be required to review the petition to determine whether it was fair and reasonable and to make detailed findings.

■ The settlement agreement also provided, however, that

Detroit Edison, while it will vigorously contest the allowance of any such fees in excess of $690,000, agrees to pay such plaintiff's attorneys' fees as approved by the Court as fair and reasonable for such services.

In order to object to a fee petition in excess of $690,000 defendant must have the right to oppose it totally. Since petitioners do seek an award substantially higher than $690,000, defendant can properly oppose the petition.[7] In any case my responsibility to review a fee petition and to conduct a hearing before awarding fees means I am not bound by the $690,000 amount which was referenced in the settlement agreement.

The second area in which the parties differ is with regard to the award of attorneys' fees for time spent on the fee petition itself. The settlement agreement provides,

Detroit Edison will not pay legal fees for the time spent by plaintiff's attorneys in connection with the preparation, presentation and support of plaintiff's attorneys' petition for fees or any appeal related thereto.

■ Based on that provision petitioners initially excluded the time spent in the preparation and presentation of the fee petition. (December 12 Tr. 29.) However, after defendant objected to the fee petition, which objection petitioners say was made in violation of the settlement agreement, petitioners seek to "withdraw" from the settlement agreement and to obtain compensation as well for their time spent in fee petition preparation.[8]

---

7. It appears that petitioners had this same understanding of paragraph 10 at the time the *stipulation of settlement was presented to me.* See, October 28, 1977 Tr. 17.

8. "MR. HARTE:
" . . . if it is the approach of the Detroit Edison Company that essentially this Paragraph 10 commits it really to nothing—if it is the position of Detroit Edison that it will not agree that the figure of 690,000 is the bottom figure, is a fair and reasonable compensation for plaintiffs' counsel in this case up to and including the date the settlement agreement was reached, then I feel the Court should be

advised as to the time that counsel have expended in pursuing this question of attorney fees for the Court's consideration here.
"It appears that the law is clear, that this is a right that they have given up which could be argued—which could be compensable. So, I would want to place on the record the hours of counsel with respect to prosecuting this question of attorney fees. We have in the record the hours expended in defending the ethics investigation. This is the point that I wanted to take up with the Court and—I suppose it is in the nature of an offer

Since I cannot agree with petitioners that defendant's position as to the $690,000 amount violates the settlement agreement, I do not agree with petitioners that they may now withdraw from the agreement. Notice of the settlement agreement was properly made to the class, a hearing was held, and I entered judgment based on the agreement as it was written. The agreement should not now be modified so as to benefit either petitioners or defendant.

### III. The Accuracy of Time Records

The approach which I have adopted to determine a fair and reasonable attorney fee grounded on the number of work hours expended requires findings as to the accuracy of time records submitted to me.

Most of the hours claimed by petitioners are documented by contemporaneously-recorded time records submitted in Plaintiff's Exhibit 15. Holstein and Sklar submitted copies of daily time cards with tapes recording the accumulation of the daily hours. Nelson and Weinstein also submitted daily time cards showing the name of the attorney, the client, the case, the time expended, and with varying degrees of specificity, the work performed. Time cards were also submitted for the hours of Richard Siegel, an attorney at the law firm of Boehm & Weinstein, who performed services for plaintiff.

The daily time cards have been reduced to time summaries, for each petitioner, contained in Defendant's Exhibits 6, 12 (chronologically by attorney), and 17 (chronologically for all attorneys). The time summaries list the date, time expended, and work performed from 1973 to March, 1979. Also included in the time summaries are itemized daily entries of hours spent by non-petitioning attorneys at the three law firms involved—Fohrman, Lurie, Sklar & Cottle, Ltd. of Chicago, Illinois; Boehm & Weinstein, Ltd. of Chicago, Illinois; and Sommers, Schwartz, Silver & Schwartz of Detroit, Michigan. These are included in Defendant's Exhibits 6 and 10.

Petitioners Holstein, Sklar, and Nelson also submitted itemized time summaries of time spent in preparation and presentation of the fee petition. These were submitted with affidavits from petitioners at the close of the hearing on the fee petition.

With a few exceptions the hours claimed by Sklar, Holstein, Nelson, and the attorneys at the three law firms who performed services for plaintiff appear to have been recorded contemporaneously. The exceptions are entries by Holstein on January 8, 1974, January 7, 1975, and November 13, 1975; by Sklar on November 6, 1975; and by Nelson on October 1, 1975 and January 12, 1976. These entries were examined in depositions and at the hearing. They occurred during periods when petitioners spent nearly all of their time on the case (e. g., preparing Supreme Court briefs) and were recorded within a few months of the date for which the time is claimed. (*See*, Defendant's Exhibit 9, Sklar Deposition 35,-121; Defendant's Exhibit 5, Nelson Deposition 44.)

Weinstein's hours were recorded contemporaneously after March 1, 1974, and hours spent on this case after that date are documented in the same manner as is detailed above for other petitioners. He testified that he began keeping daily time records in March, 1974, because of an Illinois Supreme Court opinion requiring attorneys in contingent fee cases to keep time records, and on the advice of his accountant. Weinstein's hours spent prior to March, 1974 were reconstructed in 1977. (Defendant's Exhibit 13, Weinstein Deposition 13.)

Attorney Albert Sugar, who claims 178.5 hours in this case, bases that number wholly on reconstructions done several years after the dates on which it is claimed the hours were expended.

of proof rather than in the nature of direct testimony.

"I do not want the Court to take the position that I do not feel that Detroit Edison is bound by Paragraph 10. I put that in as an alternate form of proof, however, that if they persist in what I believe to be a withdrawal from the agreement, that the Court should consider this time that I am talking about now." (Dec. 19 Tr. 357–358.)

With regard to the contemporaneously recorded hours, I find the time records of petitioners and other attorneys who performed services for plaintiff are sufficiently documented and are reasonably accurate. I include in this finding the lumped hours claimed by Sklar, Nelson, and Holstein which were recorded within a few weeks or months of the dates on which the hours were expended.

The reconstruction of work hours several years later by Weinstein and Sugar troubles me. It is difficult for me to accept such reconstructed hours when I contemplate that Weinstein and Sugar knew that this was a class action and that notice of an attorney fee award would have to be given to members of the class and approved by the court. This knowledge should have compelled these attorneys to record their time.

■ In a complex fee award case such as this, I hold that it is at the least incumbent upon counsel to keep careful time records. A failure so to do cannot be brushed aside. Recollection even though well-intentioned is often faulty. Reluctantly, I conclude that no allowance for these reconstructed hours can therefore be made.

I do not by this holding mean to cast doubt on the claim that Weinstein, prior to March 1974, and Sugar performed services on behalf of the plaintiff. I simply say that I cannot accurately determine the hours expended.

IV. Findings with Regard to Hours of Services

■ I find that hours of work spent in fee petition preparation and presentation subsequent to the approval of the settlement are not to be compensated. Thus, those hours are excluded from the fee award. Defendant contends that, in addition, hours included in the fee petition which involved work on fees spent prior to the date I entered judgment on the settlement agreement should be excluded. (Defendant's Proposed Findings, pp. 38–39.) Up to that time hours nominally classified as fee petition hours in Defendant's Exhibit 6 were also hours spent on working out the contours of the settlement. They are not excluded.

■ I also exclude from compensation hours petitioners claim were spent on the ethics investigation. The ethics investigation resulted from charges made in local newspapers that the Illinois attorneys petitioners had solicited the case, even though they were cleared of these charges by the joint investigation of the bar grievance boards of Michigan and Illinois. Petitioners argue that defendant would have benefited from the ethics investigation in that it might have voided any attorney fee. The argument is not dispositive. To say that defendant should now pay for the attorney time which was in Illinois attorney petitioners' self-interest is no showing that the time spent by petitioners in the ethics investigation was "necessary service[s] rendered in connection with the settlement of the case." (Settlement Agreement, ¶ 10.)

■ Also excluded are 5.0 hours Weinstein claims for a luncheon speech given the Chicago Bar Association and .8 hours Sklar spent with a student editor of the Mississippi Law Journal and a representative of the Chicago Law Journal. These activities had no reasonable relationship to the handling of plaintiff's case.

■ Hours spent in the MPSC proceedings after July 1, 1977 are compensable. MPSC had refused defendant's application to discontinue the light bulb program; thus, the relief plaintiff class secured through the settlement agreement was at stake.

■ Other hours claimed are also compensable. Petitioners spent time meeting with law professors and other antitrust and Supreme Court "experts." Petitioners argue that these meetings were reasonably necessary to the conduct of the case, and I so find. The necessity for the meetings does, however, reflect on petitioners' skill and experience and is a factor in calculating the reasonable hourly rate.

Accordingly, I find that the compensable hours in this case are as follows:

| | For Services Through Settlement Agreement and Notice to Class [a] | Interventions and MPSC Matters | Ethics Investigation | Fee Petition | Total |
|---|---|---|---|---|---|
| Holstein | 990.2 [b] | 159.2 [b] | –0– [b] | –0– [b] | 1149.4 |
| Sklar | 1098.1 [c] | 388.3 [c] | –0– [c] | –0– [c] | 1486.4 |
| Weinstein | 709.35 [d] | 250.55 [d] | –0– [d] | –0– [d] | 959.9 |
| Nelson | 904.75 [e] | 163 [e] | –0– [e] | –0– [e] | 1067.75 |
| Senior Attorneys from Fohrman, Lurie law firm | 37.2 [f] | 3.1 [g] | –0– [h] | None Claimed | 40.3 |
| Associate Attorneys from Fohrman, Lurie law firm | 234.1 [f] | 2.0 [g] | –0– [h] | None Claimed | 236.1 |
| Associate Attorneys from Boehm & Weinstein law firm | None Claimed | 158.9 [i] | –0– [i] | –0– [i] | 158.9 |
| Associate Attorneys from Sommers, Schwartz law firm | 12.5 [j] | 17.0 [k] | None Claimed | None Claimed | 29.5 |
| | | | | | 5128.25 |

[a] Where the service performed is not clearly identified in petitioners' time records (e. g., "Discuss status with Sklar"), I have categorized hours based upon the dates and comparable time records which are identified.

[b] Holstein claimed 1181.7 hours (Defendant's Exhibits 6 and 12) plus 86.3 hours for work on the fee petition (Affidavit). The 86.3 hours are excluded for reasons stated in the text of the opinion. The 1181.7 hours includes 990.2 hours prior to settlement and notice to the class, 159.2 hours on interventions and MPSC proceedings, 24 hours on the ethics investigation, and 8.3 hours on the petition. The latter two categories are not compensated.

[c] Sklar claimed 1581.5 hours (Defendant's Exhibit 6) plus 279.9 hours for work on the fee petition (Affidavit). The latter is not compensated. The 1581.5 hours includes 1098.5 hours prior to settlement and class notice, 388.7 hours on interventions and MPSC proceedings, 82.5 hours on the ethics investigation, and 11.8 hours on the fee petition. The latter two categories are not compensated. Also excluded are .4 hours for a conversation Sklar had on March 8, 1976 with an editor of the Mississippi Law Journal and .4 hours Sklar spent with a reporter from the Chicago Law Journal (September 11, 1978).

[d] Weinstein claimed 1177.2 hours (Defendant's Exhibit 6) plus 139 hours for work on the fee petition (Affidavit). The latter is not compensated. Included in the 1177.5 are 820.35 hours prior to settlement and notice to the class, 250.55 hours on interventions and MPSC proceedings, and 106.3 hours on the ethics investigation. Not compensated are 106.3 hours spent on the ethics investigation, 5 hours claimed on September 14, 1976 for a speech to the Chicago Bar Association, and 106 hours Weinstein reconstructed for services prior to March, 1974.

[e] Nelson claimed 1067.7 hours (Defendant's Exhibit 6) plus 122.25 hours for work on the fee petition (Affidavit). The latter hours are not compensated. The 1067.7 hours includes 904.75 hours spent prior to settlement and notice to class and 163 hours on interventions and MPSC proceedings. These are discounted by 10%.

[f] The senior attorney hours include those of Darryl Fohrman (6.1), Paul Lurie (16.7), Martin Dubowsky (2.0), Marc Simon (2.2), and William Cottle (10.2). (Defendant's Exhibit 10; Defendant's Exhibit 9—Sklar Deposition 87–89).

The associate attorney hours include those of Dubowsky (1.6), Simon (.2), Letcia Valencia (184.2), and Shari Shapiro (48.1).

[g] The senior attorney hours include those of Fohrman (.3), Lurie (1.0), and Dubowsky (1.8).

The associate hours are those of Shapiro (2.0). (Defendant's Exhibit 10).

[h] The 8.2 hours claimed, but not compensated, are those of Fohrman (.8), Lurie (1.6), Dubowsky (2.0), Simon (.4), Shapiro (3.4) (Defendant's Exhibit 10).

[i] Hours of Richard Siegel (Defendant's Exhibit 6). Siegel claimed 234.4 total hours, including 158.9 hours on interventions and MPSC proceedings, 17.1 hours on the ethics investigation, and 45.2 hours spent on the fee petition. The latter two categories are not compensated.

[j] Hours of Elaine Grand (Defendant's Exhibit 6).

[k] Hours of Roger Leemis (Defendant's Exhibit 6).

■ The 5128.25 compensable hours includes both hours of senior attorney work and hours of associate work. Petitioners contend that all of the hours spent should be compensated as senior attorney work.[9] I conclude, however, that one-fourth of the hours spent by petitioners were spent in services which were or could have been performed by associates, and therefore should be compensated as associate's work.

Most of the compensable hours accounted for by the attorneys other than petitioners were spent by attorneys of associate status at their respective law firms at the time they performed the services. The attorneys other than petitioners accounted for 464.8 total compensable hours. Of this number, 424.9 hours were spent by attorneys who were associates at the time they performed the services.[10] The 424.9 hours I consider to be compensable as associate's work.

In addition, the testimony at the hearing supports the finding that one-fourth of the hours petitioners spent were in services customarily considered associate's work. Eugene Driker, a prominent antitrust attorney, called as a witness by defendant, testified that antitrust cases are usually staffed by one senior partner, one junior partner or senior associate, and perhaps one additional associate, depending on the complexity of the case. (December 14 Tr. 203–4.) He stated that the ratio of associate's time to partner's time in an antitrust case "would generally be from one to four hours of associate time spent on a case for each hour of the partner's time, that the range, one to four, is dependent on the kind of case, the time constraints, whether it's a heavy fact case, a law case, so on." (December 14 Tr. 204.) Robert Cutler, a prominent antitrust attorney called as a witness by petitioners,

testified that in antitrust cases with which he is familiar, staffing consisted of one senior partner, one junior partner or senior associate, one or two younger associates, and one paralegal. (December 19 Tr. 305.)

In this case petitioners accounted for approximately 91% of the compensable hours spent in the case. It is not possible, by reviewing the cold evidence, to identify which of the petitioners' hours were spent in work customarily done by associates. Petitioners argue that none of the hours should be considered work customarily performed by associates, because these senior attorneys were more efficient than less-experienced associates and because the significant questions in the case involved "refined legal issues" better handled by experienced senior attorneys. (December 19 Tr. 337,- 338.) Petitioners' time records belie their argument. The time records show a large number of hours were spent in research and in factual investigation. In addition petitioners described the process by which their briefs and pleadings were drafted. Drafts of portions of briefs, customarily done by associates, were written by the petitioning attorneys. (December 12 Tr. 59–62, December 19 Tr. 334,335.) Review of the drafts and final polishing, customarily done by one senior partner with the associates on the case, was here done by the four petitioning attorneys. Finally, the numerous conferences and telephone calls necessary to conduct the case, which customarily would have involved one senior partner and the associates on the case, were here attended by the four petitioning attorneys, all of whom were managing the case. (Defendant's Exhibit 9, Sklar Deposition 23.)

My conclusion that some of petitioners' hours were spent at services which custom-

---

9. In the fee petition petitioners seek $125 per hour for all attorney hours spent in the case. That hourly rate is based on current hourly rates for senior attorneys. *See* discussion *infra*.

10. Includes hours of Martin Dubowsky and Marc Simon through 1976 (Defendant's Exhibit

10; Defendant's Exhibit 9—Sklar Deposition 87); hours of Letcia Valencia and Shari Shapiro (Defendant's Exhibits 10, 9 at p. 88,89); hours of Richard Siegel (Defendant's Exhibits 6, 13 at p. 20,21); hours of Elaine Grand and Roger Leemis (Defendant's Exhibits 10, 5 at p. 20, 21).

arily would have been performed by associates is supported by the evidence. My approach of considering 25% of the compensable hours petitioners spent as associate hours I believe is reasonable in that it is based on the testimony of Driker and Cutler which showed that the percentage of hours petitioners spent was far higher than is customarily spent by senior attorneys in antitrust cases. It is also consistent with the Court of Appeals statement in *Northcross*, at 637:

> While necessary services performed by attorneys which could reasonably have been performed by less expensive personnel may be compensated at a lower rate than an attorney's normal billing rate, they should not be excluded altogether.

I therefore conclude that the figure of 5128.25 total compensable hours includes 424.5 hours expended by associates other than petitioners, and 1165.86 [11] hours expended by petitioners in which they performed associates' work. The remaining hours constitute senior attorney's hours in this case.

Finally, defendant argued that petitioners' use of four senior attorneys in this case warrants a 25% reduction in the total compensable hours because of duplication. I do not make any such deduction having already adjusted the hours of work of senior and associate attorneys.

**V. Findings with Regard to a Reasonable Hourly Rate**

My determination of a reasonable hourly rate for the hours to be compensated is based on the following findings of fact.

(a) Petitioners currently charge about $100 per hour for their respective service. Sklar testified that his hour rate in 1979 (the most recent evidence submitted) was $100 per hour, with additional charges for secretarial time and a premium where the client has caused substantial time constraints or financial responsibility for the law firm. (December 12 Tr. 68.) Holstein,

a partner with Sklar in a Chicago law firm until late 1979, had the same billing rates at the firm as did Sklar. (Defendant's Exhibit 6, p. 6.) Weinstein also billed clients $100 per hour in 1979 in the few cases he took on an hourly rate basis. (Defendant's Exhibit 13, p. 9.) Nelson's rates in 1979 for non-contingent contested litigation ranged from $60 to $100 per hour as negotiated on a client-by-client basis. (Defendant's Exhibit 6, p. 7.)

■ I have determined that current rather than historical (i. e., contemporaneous to services rendered) rates should be applied. The attorneys have waited up to eight years to be compensated for their work. This delay and the effect of inflation are factors I do consider in determining a reasonable hourly rate. *Lindy Bros. v. American Radiator*, 540 F.2d 102 at 117; *see also, City of New York v. Darling-Delaware*, 440 F.Supp. 1132, 1134 (S.D.N.Y.1977) ("the attorneys in this case have waited 7 years to receive any compensation . . . it seems that a calculation at present rates is appropriate to compensate for loss of interest and inflation."). The opposite result was reached in *Locklin v. Day-Glo Color Corp.*, 378 F.Supp. 423, 427 (N.D.Ill.1974), where the court stated

> "in the context of an inflationary period, adoption of this approach [current rates] would result in a windfall to petitioners and might encourage dilatory fee applications."

Here there was no "dilatory fee application," and I do not believe that application of current rates will result in a windfall to petitioners.

(b) The current hourly rate charged by experienced antitrust attorneys in the Detroit area is $105–$115 per hour. (Defendant's Exhibits 2, 15; December 14 Tr. 205.)

■ Petitioners argue that customary hourly rates charged in other cities should

---

11. Calculated as 25% of 4663.45 (the sum of petitioners' compensable hours).

be reflected in the fee award because the attorneys involved in this case, on behalf of both the plaintiff and defendant, were from cities where prevailing hourly rates are generally higher than those in Detroit. The argument runs contrary to the case law which holds that the hourly rate should be based, in part, on the prevailing or customary rate for such services *in the community*. *See, Northcross, supra,* at 638; *Report of Folding Carton Fee Committee*, p. 22 n. This does not mean that attorneys may never be compensated at a rate higher than the prevailing rates in the community in which the litigation was based. If appropriate, the efforts of out-of-town counsel should be reflected in the hourly rate by virtue of a finding regarding the "experience, reputation, and ability" of the attorney (*supra*, factor # 9, n.6).

 (c) I find that when I consider petitioners' "experience, reputation, and ability" (*supra*, factor # 9, n.6) this does not warrant an increase in the hourly rate over the rate they customarily charge. Although petitioners are experienced attorneys in general commercial and corporate law and in litigation, they are not specialists in antitrust law (December 12 Tr. 45–47; December 14 Tr. 177; December 19 Tr. 344) nor do they have extensive experience in litigating class actions or in arguing cases before the United States Supreme Court. In fact their lack of experience in the areas of law which involved most work in this case necessitated numerous hours spent in research [12] and in frequent conferences with experts in antitrust and Supreme Court litigation.

 (d) The Court of Appeals has stated that

> it is desirable, whenever possible, to vary the hourly rate awarded depending upon the type of service being provided.

*Northcross, supra,* at 638; *see also, Oliver, supra,* at 717. In *Northcross,* at 638, the Court of Appeals suggested the use of broad categories, differentiating

> between paralegal services, in-office services by experienced attorneys and trial service.

The petitioners testified that they make no distinction in their customary billing rates between trial services and office services. (December 12 Tr. 68.) This is apparently also the customary practice among antitrust attorneys in the Detroit area. (Defendant's Exhibits 2, 15; December 14 Tr. 205; December 19 Tr. 304.) I do not therefore distinguish, for purposes of separate hourly rates, hours spent in office from hours spent in trial. Since this case was settled before trial, very little of the time spent by the attorneys was in court. There is no reason therefore to increase the hourly rate to reflect time spent in trial.

 I do, however, distinguish for purposes of separate hourly rates the hours of senior attorney work and the hours of associate work in this case. *See, Northcross, supra,* at 637; *cf. Johnson v. Georgia Highway Express,* 488 F.2d 714, at 717 (5th Cir. 1974).

(e) I find that petitioners currently charge $100 per hour; that the hourly rate in this case should be the current rate, not the historical rate; that the rate should be that charged for comparable work in the Detroit area; that petitioners are not experienced antitrust attorneys and that very few hours were spent in court; therefore, no increase in the hourly rate over the rate they customarily charge should be allowed. Considering all of these factors, I conclude that an hourly rate subject to upward ad-

12. E. g., Nelson stated that he spent hours early in the case "familiarizing myself with the cases at the Federal level under the antitrust law." (Defendant's Exhibit 5, Nelson Deposition 35.) In contrast, Basil Mezines, an experienced antitrust attorney in Washington, D. C., and one of the attorneys petitioners consulted, stated that when a client comes into his office with an antitrust problem, "We know what the cases are. We know them intimately. We are able to quote them, to cite them, and we are able to prepare a memorandum." (Plaintiff's Exhibit 13, Mezines Deposition 10.)

justment for senior attorneys' time is $100 an hour.

(f) The current hourly rate for associates' time in the Detroit area is $50–$85 per hour, depending on the experience of the associate. (Defendant's Exhibit 2; December 14 Tr. 206.) I find that a reasonable hourly rate for associate attorney time spent in this case is $85 per hour.

## VI. Findings with Regard to an Upward Adjustment

In *Northcross, supra,* at 638, the Court of Appeals stated:

> In many cases that rate [the routine hourly rate] is not 'reasonable,' because it does not take into account special circumstances, such as unusual time constraint, or an unusually unpopular cause, which affect the market value of the services rendered. Perhaps the most significant factor in these cases which at times renders the routine hourly rate unreasonably low is the fact that the award is contingent upon success . . . [cases] in developing areas of law or where the facts are strongly disputed, will require a substantial upward adjustment to compensate for the risk.

I note that as the court adopted this "upward adjustment," it denied the award of a "bonus multiplier":

> Such a 'bonus' would indeed be a 'windfall,' unnecessary to attract competent counsel, and grossly unfair to the defendants, who in most cases will be paying the award out of public funds. We see no reason to allow individual attorneys, no matter how important the rights they have vindicated, to receive unearned personal gain at the public expense.[13]

13. In denying a bonus multiplier in *Northcross* the Court of Appeals relied on language in *Oliver, supra,* at 715, where the court stated:
"The use of the multiplier was without statutory authority. The antitrust cases relied upon by the district court are inapposite since there is usually a large monetary recovery in those cases."
Petitioners seek to distinguish *Northcross* and *Oliver* on this basis. I believe the *Northcross*

■ The adjustment recognized by the Court of Appeals in *Northcross* as applied here compensates for the risk of failure that was implicit in the case. Prior to the time when the United States Supreme Court granted the writ of *certiorari,* the risk of failure was substantial. The fact that I granted defendant's motion for summary judgment and the Court of Appeals affirmed is evidence that the law appeared to be squarely against plaintiff's position in the case. Even after the Supreme Court's grant of *certiorari* and subsequent reversal, there was still a substantial risk that plaintiff would be unable to show that defendant's light bulb program violated antitrust laws. That risk was lessened somewhat by the Supreme Court's decision because, as I noted in my opinion of April 14, 1978, without settlement of the case, plaintiff's risk was countered by defendant's risk of liability for treble damages. Although petitioners' involvement in intervenor and MPSC proceedings was necessary to protect the settlement, there was nonetheless at that point a settlement agreement between the parties which had been approved by me. Thus, I find that after the settlement agreement was approved, the risk of failure to petitioners was slight.

■ A final factor to be considered in determining the extent of the risk petitioners undertook is the fact that here four attorneys bore the risk almost equally. Petitioners each spent in the area of 1000 hours on the case through settlement and notice to the class. Because the workload was shared, none was generally precluded from other employment (factor # 4, n.6, *supra*).

In *Northcross* the Court of Appeals stated

holding should be read more broadly to include all attorney fee cases. The approach utilized by the Court of Appeals—the number of hours expended multiplied by a reasonable hourly rate—is based on what the attorneys actually earned by their work. Consistent with this approach is the court's denial of any bonus or multiplier which suggests a windfall to the attorneys. Thus, the Court of Appeals' denial of a multiplier is followed here.

We also note that in a long and complicated lawsuit such as this one, only a portion of the time expended can be reasonably regarded as contingent; once liability is established the attorney is assured of compensation for establishing the appropriate remedy, monitoring the decree, and recovering his fee.

Thus, in determining a reasonable fee I find that the substantial risk petitioners carried prior to the approval of the settlement merits an upward adjustment of 50% in the hourly rate for the hours of attorney time spent prior to that date. I also find that the risk of failure was slight after I entered my order approving the settlement. For hours spent on the intervenors and MPSC proceedings no upward adjustment is made. Accordingly, the hourly rate for senior attorney time through the settlement agreement and notice to the class is determined to be $150 per hour. The hourly rate for associate time for the same period is determined to be $127.5 per hour. For hours expended after the settlement was approved, the hourly rate remains $100 per hour for senior attorney time and $85 per hour for associate time.

VII. Expenses

The settlement agreement, paragraph 10, provides that

Detroit Edison agrees to reimburse plaintiff's attorneys for their actual out-of-pocket expenses, as approved by the Court.

Petitioners have submitted the following documentation of expenses incurred. Defendant's Exhibit 8 is an itemized expense list for expenses incurred by the Sommers, Schwartz law firm, totaling $7,056.32. Defendant's Exhibit 11 is an itemized expense list for expenses incurred by the Fohrman, Lurie law firm, totaling $54,776.37. Plaintiff's Exhibit 15 includes photocopies of invoices of expenses incurred by Weinstein

totaling $3,347.38.[14] In addition petitioners seek reimbursement for paralegal time. The hours spent by paralegals from the Fohrman, Lurie law firm are itemized in Defendant's Exhibit 6, and photocopies of daily time cards are included in Plaintiff's Exhibit 15. The itemized records show the date, description of the work done, and the time spent by individual paralegals at the law firm. Petitioners also claim 15.0 hours were spent by paralegals at the Boehm and Weinstein firm (Fee Petition, p. 17; Defendant's Exhibit 13, Weinstein Deposition 67), but no itemized records for these hours have been submitted.

■ The expenses I allow are those reasonably related to the conduct of the case during the proceedings for which I have allowed the attorneys' fees to be awarded, i. e., for the proceedings in the case through the settlement and notice to the class and the MPSC and intervenors proceedings.

The expenses listed by the Sommers, Schwartz law firm (Defendant's Exhibit 8) are allowed with the following exceptions.

— The filing bond for the appeal to the Court of Appeals, listed on August 29, 1974, in the amount of $250.00. Nelson testified that the bond has been refunded. (Defendant's Exhibit 5—Nelson Deposition 81.)

— A $540.00 item on September 30, 1976 for a transcript, which appears to be a duplication of an earlier listed item on April 29, 1974. (Defendant's Exhibit 5—Nelson Deposition 84, December 14 Tr. 99.)

— The expense listed on November 6, 1975 for $1,200.00 for the part of the cost of the appendix for submission to the United States Supreme Court. These costs were paid by defendant.

— Expenses listed for the year 1979. Although the expense list does not fully identify the expenses, it ap-

14. Some items for which photocopies receipts were submitted are questionable. For example, in Plaintiff's Exhibit 15 an American Express charge for which petitioners seek reimbursement is simply listed "Leather Shop, Chicago, Illinois—$75.18." I will allow such an

item even though poorly identified. I also note that Weinstein has claimed expenses of $4,953.29. I cannot allow undocumented expense items and hence the resolution to $3,347.38.

pears that they related to the fee application. In addition, expenses listed after August, 1978, when the final proceedings in the MPSC proceedings took place appear also to relate to the fee petition, and since they are not further identified, I have no basis for allowing them. Thus, $352.02 is excluded from the expenses listed for 1978, and $207.08 for expenses listed in 1979.

Total expenses allowed for the Sommers, Schwartz law firm amount to $4,507.22.

The expenses listed by the Fohrman, Lurie law firm (Defendant's Exhibit 11) are allowed with the following exceptions.

— Payments for services rendered by the law firm of Dykema, Gossett, Spencer, Goodnow and Trigg, in the amount of $8,037.75. These expenses related to the ethics investigation. (Defendant's Exhibit 9—Sklar Deposit 79.)

— Payments to McMasters Associates Public Relations Firm, in the amount of $3,945.68. The expense was incurred after the settlement was entered to counteract adverse publicity the case had created for Lawrence Cantor. (December 19 Tr. 340.) While the employment of the public relations firm may have been a reasonable act on the part of petitioners, I do not find that the expense was reasonably related to the law-suit. Had petitioners felt the public relations effort was necessary to the lawsuit and therefore should be charged to defendants, they should have sought my approval before incurring the expense. *Northcross, supra,* at 640.

— Expenses listed as incurred in 1979. Sklar testified that these related to the fee petition. (Defendant's Exhibit 9—Sklar Deposition 113.) These total $357.15. In addition, Sklar identified expenses incurred in 1978 in the amount of $765.00 as relating to the ethics investigation. (Defendant's Exhibit 9—Sklar Deposition 109–112.)

— The expense listed on December 12, 1975 for printing costs of the appendix in the amount of $1,877.48. This expense has already been paid by defendant. (December 14 Tr. 99; Defendant's Exhibit 9—Sklar Deposition 98.)

Total expenses allowed for the Fohrman, Lurie law firm amount to $39,793.31.

■ The photocopied receipts for expenses for which the Boehm and Weinstein firm seeks reimbursement total $3,347.38. Of this amount $116.25 is Weinstein's share of printing costs for a brief, the total expense of which is included in the expenses of the Fohrman, Lurie firm (January 16, 1975). In addition, a receipt showing $86.00 expense for plane fare was apparently incurred during proceedings on the ethics investigation. (Defendant's Exhibit 9—Sklar Deposition 110). These two expenses are not allowed. The total amount allowed as expenses for the Boehm and Weinstein firm is $3,145.12.

■ With regard to the hours of paralegal time claimed by petitioners, twenty-four of the hours are identified in the time summaries as relating to the ethics investigation. The remaining 142.2 hours expended by paralegals are allowed as an expense. The current hourly rate for paralegal hours in Detroit is $30.00 (Defendant's Exhibit 2), and I adopt that rate here. Total compensation for paralegals at the Fohrman, Lurie firm is $4,266.00.

The 15.0 hours claimed for paralegal time at the Weinstein and Boehm law firm is not documented and is not allowed.

Total expenses allowed for all law firms amounts to $51,711.65.

VIII. Conclusion

■ Based on the preceding findings with regard to the number of hours expended by attorneys on plaintiff's behalf and a reasonable hourly rate, the attorney fee awarded to the petitions is $679,488.10. The award consists of the following hours and hourly rates:

| | Senior Attorneys through Settlement | Senior Attorneys Post-Settlement | Associates through Settlement | Associates Post-Settlement |
|---|---|---|---|---|
| Hours | 2814.00 | 723.89 | 1172.20 | 418.16 |
| Hourly Rate | 150.00 | 100.00 | 127.50 | 85.00 |
| | $422,100.00 | $72,389.00 | $149,455.50 | $35,543.60 |

I also allow expenses incurred by petitioners in the amount of $51,711.65.

In the settlement agreement, notice as to which was given to all members of the class, petitioners stated they would not seek fees in excess of $1,575,000.00. In their proposed findings of fact, petitioners seek an attorney fee award of $2,020,139.50. While the award made is considerably less than that requested, I find it is a reasonable attorney fee award and amply compensates petitioners for their efforts.

An appropriate order may be entered.